UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cv-20780-BLOOM/Otazo-Reyes

NUTRADOSE LABS, LLC,

     Plaintiff,

v.

BIO DOSE PHARMA, LLC, *et al.*,

     Defendants.

_____/

## OMNIBUS ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Plaintiff Nutradose Labs, LLC's ("Nutradose" or "Plaintiff") Motion for Partial Summary Judgment, ECF No. [60] ("Plaintiff's Motion"), and Defendants Bio Dose Pharma, LLC ("Bio Dose") and Raimundo Santamarta's ("Santamarta") Motion for Summary Judgment, ECF No. [66-1] ("Defendants' Motion").[1] Plaintiff filed a Response to Defendants' Motion, ECF No. [74-1], along with a Response to Defendants' Statement of Material Facts and Statement of Additional Facts, ECF No. [74-2] ("Pl.'s CSMF"); and Defendants filed a Response to Plaintiffs' Motion, ECF No. [73], along with a Counterstatement of Material Facts, ECF No. [75] ("Defs.' CSMF").[2] Plaintiff filed a Reply, ECF

---

[1] The Court refers to Plaintiff's Motion and Defendants' Motion collectively as the "Motions." The parties filed Statements of Material Fact in support of their respective Motions. *See* ECF Nos. [61] ("Pl.'s SMF") and [66-2] ("Defs.' SMF"). Defendants filed their Motion and their Statement of Material Facts under seal. Defendants also filed redacted versions of their Motion, ECF No. [62], and the Statement of Material Facts, ECF Nos. [63] – [65].

[2] Plaintiff filed their Response to Defendants' Motion and their Response to Defendants' Statement of Material Facts and Statement of Additional Facts under seal. Plaintiff filed redacted versions of their Response to Defendants' Motion, ECF No. [71], and a redacted version of their Response to Defendants' Statement of Material Facts and Statement of Additional Facts, ECF No. [72]. Defendants filed their Response to Plaintiff's Motion and their Counterstatement of Material Facts under seal.

No. [84], along with a Reply Statement of Material Facts, ECF No. [86-1]; Defendants filed their

Reply, ECF No. [89-1], along with a Reply Statement of Material Facts, ECF No. [89-2] ("Defs.'

RSMF").[3] The Court has reviewed the parties' Motions, their Responses, their Replies, all the

statements of material fact, the record in this case, and the applicable law, and is otherwise fully

advised. For the reasons below, the Court denies the Defendants' Motion and grants in part and

denies in part Plaintiff's Motion.

## I.       BACKGROUND AND MATERIAL FACTS

This action arises due to alleged infringement by Defendants of Nutradose's trademark.

*See generally* ECF No. [1] ("Nutradose"). In the Complaint, Nutradose alleges that an entity named

Unipharma, LLC was a pharmaceutical development and manufacturing company that

manufactured a line of dietary supplements under the GLUTADOSE mark. *Id.* ¶ 10-11. Unipharma

registered the GLUTADOSE mark on December 24, 2019. *Id.* ¶ 12. Less than one year later,

Unipharma filed for Chapter 11 bankruptcy, in which Defendants were listed as creditors. *Id.* ¶ 13.

According to Nutradose, the bankruptcy court approved the sale of certain assets of Unipharma,

to which Defendants did not object. *Id.* ¶ 15. Through the bankruptcy sale, NHTV (AIV) ULM

BIDCO ("New Vision") acquired the intellectual property of Unipharma, including the

GLUTADOSE mark, and internet and social media accounts and profiles connected to the products

and mark. *Id.* ¶ 16. Nutradose alleges that through the bankruptcy sale, Defendants lost any rights

they may have had to use the GLUTADOSE mark or sell products bearing the GLUTADOSE

mark ("GlutaDose Products"). *Id.* ¶ 17.

---

[3] Defendants filed their Reply and Reply Statement of Material Facts under seal. Defendants also filed a redacted version of their Reply, ECF No. [87], and a redacted version of their Reply Statement of Material Facts, ECF No. [88].

On December 17, 2021, Nutradose purchased the rights to the GLUTADOSE mark from New Vision, including internet domains and social media accounts. *Id.* ¶ 25. According to Nutradose, Defendants continue to violate the bankruptcy sale by improperly infringing on the GLUTADOSE mark and have unlawfully taken possession of the GLUTADOSE social media accounts and profiles. *Id.* ¶¶ 27, 29.

As a result of Defendants' alleged actions, Nutradose asserts the following five claims:

1. Federal Trademark Infringement (15 U.S.C. § 1141(a)) (Count I);

2. Common Law Trademark Infringement (Count III);

3. False Designation of Origin (15 U.S.C. § 1125(a)) (Count II);

4. Conversion (Count IV); and

5. Unfair and Deceptive Trade Practices (Fla. Stat. § 501.204) (Count V).

Defendants assert the following six affirmative defenses:

1. Failure to state a claim upon which relief can be granted (First Affirmative Defense) and No damage (Fourth Affirmative Defense);

2. Laches (Second Affirmative Defense);

3. License (Third Affirmative Defense);

4. The GLUTADOSE trademark "was not distinctive at the time of registration of the domain name" (Fifth Affirmative Defense); and

5. Exhaustion/First Sale Doctrine (Sixth Affirmative Defense).

**A. The Motions**

**1.    Defendants' Motion**

Defendants set forth six primary arguments in support of their Motion. First, Plaintiff lacks standing to bring its claims because the assignment to Plaintiff of the trademark was an invalid "assignment in gross" and because Plaintiff's license to the assignor of the trademark to

manufacture GlutaDose Products was an invalid "naked license." ECF No. [66-1] at 15-18.[4] Alternatively, Plaintiff lacks standing to bring any claims for any conduct or agreement prior to the date of its assignment, December 17, 2021. *Id.* at 19-20. Second, summary judgment is warranted on Counts I through III because Defendants sold genuine, unaltered GlutaDose Products, an activity protected by the exhaustion doctrine. *Id.* at 20-25. Third, Plaintiff has failed to adduce evidence of specific instances of purported infringement of the GLUTADOSE mark, and Plaintiff's infringement claims fail, to the extent that they are premised on Defendants' infringement of the GLUTADOSE marks registered in Mexico, the Dominican Republic, and countries in the European Union as Plaintiff never owned those foreign marks. *Id.* at 25-34. Fourth, Plaintiff's claim fails under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*, Count V, because Defendants' trademark infringement claims fail. *Id.* at 30. Fifth, Plaintiff's conversion claim, Count IV, also fails because Defendant abandoned the Instagram Accounts and the GlutaDose brand in the Amazon Brand Registry ("Amazon Brand") before Plaintiff obtained the rights to those accounts and the Amazon Brand. *Id.* at 30-31. Sixth, Plaintiff's claims are barred by laches. *Id.* at 32-33. Defendants also seek attorney fees and costs because the instant action is an "exceptional case" justifying the award. *Id.* at 33.

**2.      Plaintiff's Motion**

In its Motion, Plaintiff advances three sets of arguments. First, Defendants are liable on all Counts in the Complaint. ECF No. [60] at 14-26. Second, several of Defendants' affirmative defenses fail as a matter of law. Third, Plaintiff is entitled to an entry of a permanent injunction

---

[4] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings, when citing to the record, except when the cites to deposition testimony. When citing to deposition testimony, the Court uses the pagination appearing on the pages of the transcript of the testimony.

against Defendants, a finding that Plaintiff is entitled to recover Defendants' profits and actual damages, and Plaintiff is entitled to its attorney fees and costs.

### B.  Material Facts

Based on the parties' Statements, Counterstatements, Reply Statements of Material Facts, and evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

#### 1.  Unipharma

Unipharma, LLC ("Unipharma") is a Florida limited liability company established in Tamarac, Florida in 2012. Pl.'s SMF ¶ 1; Defs.' CSMF ¶ 1. Unipharma owned, managed, and operated a blowfill-seal manufacturing facility that packages pharmaceuticals and nutraceutical oral and ophthalmic solutions. Pl.'s SMF ¶ 1; Defs.' CSMF ¶ 1. Santamarta was the controlling member, officer, and acting president of Unipharma. Santamarta's children were acting members of Unipharma and assumed management roles. Pl.'s SMF ¶ 2; Defs.' CSMF ¶ 2. Santamarta is a manager of, and possesses a 90% stake in, Bio Dose. Pl.'s SMF ¶ 3; Defs.' CSMF ¶ 3.

#### 2.  Unipharma Registers the GLUTADOSE Trademark

The parties dispute when Unipharma began manufacturing GlutaDose Products, which are antioxidant dietary supplements. Pl.'s SMF ¶ 6; Defs.' CSMF ¶ 6. On April 2, 2019, Unipharma filed U.S. Trademark Application Serial Number 88/189,823 with the United States Patent and Trademark Office (USPTO) for the mark GLUTADOSE in connection with "dietary supplements with antioxidant and cell protection properties which also supports [sic] the immune system." Pl.'s SMF ¶ 7; Defs.' CSMF ¶ 7. GLUTADOSE mark is reproduced immediately below.

GlutaDose

ECF No. [1-1].

**3. The Trademark License Agreement, Unipharma's Bankruptcy, and the Asset Purchase Agreement**

The record reflects that Unipharma licensed the GLUTADOSE mark to Bio Dose, that Unipharma subsequently went bankrupt, and that Unipharma transferred the mark to the entity, New Vision Pharmaceuticals LLC ("New Vision"). According to the Declaration of Alan Petro ("Petro Decl."), New Vision is a pharmaceutical development and manufacturing company formed in early 2021. Petro Decl. ¶ 3-4, ECF No. [61-1]. On September 13, 2019, a trademark license agreement was executed between Unipharma and Bio Dose that authorized Bio Dose to use the GLUTADOSE trademark ("Trademark License Agreement"). Pl.'s SMF ¶ 9, ECF No. [61]; Defs.' CSMF ¶ 9, ECF No. [75]. The Trademark License Agreement contains no obligations that survive a termination of the agreement. *See* ECF No. [61-6].

On December 7, 2020, Unipharma filed for Chapter 11 bankruptcy. Pl.'s SMF ¶ 10, ECF No. [61]; Defs.' CSMF ¶ 10, ECF No. [75]. As a result, New Vision acquired the entirety of the GlutaDose line of business and intellectual property, including the underlying formulations, inventory, and the GLUTADOSE Mark, together with all associated goodwill, as part of the bankruptcy court's ordered sale (*see generally* ECF No. [61-8] ("Court Ordered Sale")). Pl.'s SMF ¶ 12; Defs.' CSMF ¶ 12. The Court Ordered Sale approved an agreement dated December 7, 2020 ("Asset Purchase Agreement"). Pl.'s SMF ¶ 14; Defs.' CSMF ¶ 14; *see also* ECF No. [61-8] ("this Court having authorized the Debtors to enter into the Agreement, dated as of December 7, 2020 . . . pursuant to which the [Purchaser] . . . agreed to be the stalking horse bidder with respect to the Purchased Assets . . . with such sale to be in accordance with the terms and conditions of the Agreement[.]"). The Asset Purchase Agreement identifies NHTV (AIV) ULM Bidco LLC as the "Buyer" and Unipharma, and Tamarac 10200, LLC, as the "Sellers" and "Debtors." ECF No. [1-

2] at 7. NHTV (AIV) ULM Bidco LLC is now known as New Vision. Defs.' CSMF ¶ 56; Pl.'s RSMF ¶ 56.

The Asset Purchase Agreement contains the following provisions. Schedule 4.9(a) lists all Trademarks and Trademark Applications transferred to New Vision. ECF No. [1-2] at 178. Section 6.12 states as follows:

> BioDose Arrangements. Prior to Closing, the Sellers shall (a) terminate all prior arrangements or agreements, whether oral or in writing, between each of the Sellers and BioDose Pharma, LLC ("BioDose"), as applicable, and (b) use commercially reasonable efforts to enter into a new Contract in writing between Unipharma and BioDose on terms reasonably acceptable to Buyer and Unipharma.

ECF No. [1-2] at 59.

### 4. Sales of GlutaDose Products by Unipharma to Bio Dose

Santamarta testified that Bio Dose "[s]ells products developed by Unipharma." ECF No. [61-3] ("Santamarta Dep.") at 18:18-19. Bio Dose shipped and sold GlutaDose Products to customers in the U.S., Venezuela, Ecuador, and Mexico. Pl.'s SMF ¶ 23; Defs.' CSMF ¶ 23.

The record contains evidence of several shipments of GlutaDose Products. Those shipments are further described in the Discussion section below, and the rights and obligations of the parties regarding the products in those shipments depend on the shipment dates. The record contains evidence of one shipment, a packing slip dated August 20, 2020 from Unipharma, that identifies Bio Dose as the recipient of four units of "Unipharma GlutaDose Guard 10ml 12 ct." ECF No. [61-4] at 477.

On January 29, 2021, Elizabeth Gregor, an Accounts Receivable Analyst at Unipharma, emailed German Perez ("Perez"), a representative of Bio Dose, the following regarding another shipment associated with purchase order number 1089-2021:

I noticed PO 1089-2021 order has the following:

| DESCRIPTION: | QTY | RATE | AMOUNT | |
|---|---|---|---|---|
| 1.Glutadose Guard 10ml 6 ct | 176 | 172.80 | $30,412.80 | Batch 2020-00142 |
| 2.Glutadose Guard 10ml 6 ct | 425 | 172.80 | $73,440.00 | Batch 2020-00176 |
| 3.Glutadose Guard 10ml 6 ct | 279 | 172.80 | $48,211.20 | Batch 2020-00177 |

The third line item is a problem as we only have the 12 ct of FG – 0051 We have entered this sales order but we exchanged the third line item for the following . . .

| DESCRIPTION: | QTY | RATE | AMOUNT |
|---|---|---|---|
| 1.Glutadose Guard 10ml 12 ct | 259 | 190.08 | $49,230.72 |

Below is the Batch information for the 12 ct:
- Batch 2020-00128
- Batch 2020-00151
- Batch 2020-00177

The new total for this Purchase Order will be as follows: . . . $153,083.52.

ECF No. [61-4] at 315.

The record also contains an invoice dated February 5, 2021 from Unipharma with the Customer Reference Number 1089-2021. *Id.* at 317-18. That invoice identifies Bio Dose as the customer of shipments of "Unipharma GlutaDose Guard 10ml 6ct" and "Unipharma GlutaDose Guard 10ml 12 ct." *Id.* The record also contains a packing slip with the same Customer Reference Number, 1089-2021. *Id.* at 478. That packing slip is dated February 5, 2021 and identifies Bio Dose as the recipient and customer of shipments of 176 units of "Unipharma GlutaDose Guard 10ml 6ct" and 259 units "Unipharma GlutaDose Guard 10ml 12 ct." *Id.*

The record contains a document dated May 11, 2022 and titled "Expense Transactions." ECF No. [61-4] at 311. One line item in that document describes a bill from New Vision for $6,760.00 dated May 3, 2021. *Id.* A note on that line item states, "After Bankcorrupty [sic] this

amount US\$ [sic] 6.760 paso a [sic] New Vision Pharmaceuticals." *Id.* Two other line items

describe an amount due for "Interest Paid" in the amounts of \$110.01 and \$75.26. *Id.* Another line

item reflects a payment of \$6,760.00 to New Vision that is dated May 27, 2021. *Id.* Two other line

items reflect payments of \$110.01 and \$75.26. *Id.* Regarding these line items, Perez testified as

follows:

> Q. Okay. So this is the amount that was paid to New Vision for the transportation
> error with the interest. Correct?
> A. Not exactly, because it was not an error in transportation. The interests were
> because--well, let me separate this. The interests were because New Vision charged
> us during the last shipment. We took some time and were delayed a few days in
> paying for the invoices which were New Vision's but were really sent by
> Unipharma, and that's why they charged us for the interests. And the one for the
> 6,760, which was for the freight, which was the charges for the freight which we
> paid, which Bio Dose paid Unipharma first directly, and later we had to pay
> Conavenca, and then Bio Dose reduced that from Unipharma. And Mr. Petro, in
> the end, charged me the interests for New Vision because I imagine that at that time
> he could no longer do it through Unipharma because the invoices that generated
> that discount were done through Unipharma.

ECF No. [63-2] at 54:22-56:2 ("Perez Dep.").

In addition to the transactions described above, Bio Dose purchased GlutaDose Products

from Alchemy Valley, LLC ("Alchemy") from January 2021 through August 2021. Pl.'s SMF

¶ 26; Defs.' CSMF ¶ 26; *see also* Santamarta Decl. ¶ 30, ECF No. [64-1]; Perez Dep. ¶ 27:3-6,

88:13-15. On August 2021, New Vision stopped selling GlutaDose Products to Alchemy. Pl.'s

SMF ¶ 29; Defs.' CSMF ¶ 20. The parties dispute whether New Vision was aware that Alchemy

had sold GlutaDose Products to Bio Dose. Defs.' CSMF ¶ 30; Pl.'s SMF ¶ 29. The Petro

Declaration states, "[h]ad New Vision known that the GLUTADOSE branded products sold to

Alchemy Valley, LLC were going to be sold in the United States or to Bio Dose, New Vision

would not have sold to Alchemy Valley, LLC." Petro Decl. ¶ 26, ECF No. [61-1].

Jairo Escobar ("Escobar"), a corporate representative for Alchemy, testified that Alchemy conducted market research in Colombia to become a distributor of Unipharma for Unipharma products in Colombia. ECF No. [75-1] ("Escobar Dep.") at 17:6-18. Escobar further testified that Alchemy purchased GlutaDose Products to that end, but that Unipharma's bankruptcy and "different circumstances that didn't allow this situation or the distribution in Colombia to happen." *Id.* Perez testified that Alchemy sold its entire inventory of GlutaDose Products because "they were upset since they were no longer going to continue manufacturing or do something with what they had for Colombia and they lost money." Perez Dep. at 90:18-23.

The Santamarta Declaration states that "Bio Dose continued to sell the inventory of GLUTADOSE product that it had purchased from Unipharma prior to the bankruptcy." Santamarta Decl. ¶ 29. Bio Dose currently has GlutaDose inventory. Pl.'s SMF ¶ 53; Defs.' CSMF ¶ 53.

### 5.      The Quality of the GlutaDose Products

A supplemental Declaration dated January 18, 2023 by Alejandro Gonzalez, a manager, member and Chief Financial Officer (CFO) of Nutradose, states that "Nutradose has only and is only using the GLUTADOSE trademark on the GlutaDose Products, and the quality of the GlutaDose Products has remained virtually identical since the Assignment of all rights to Nutradose in December 2021." Gonzalez Suppl. Decl. ¶ 17, ECF No. [74-4].

### 6.      Manufacturing and Supply Agreement and Purchase Agreement

On December 17, 2021, New Vision Pharmaceuticals, LLC ("New Vision") and Nutradose Labs, LLC ("Plaintiff") entered into a Manufacturing and Supply Agreement and Purchase

Agreement ("MSAPA" or "MSAP Agreement"). MSAPA at 1, ECF No. [66-3] at 2.[5] Section 3 of

the MSAPA provides as follows:[6]

> Sale to Company of Intellectual Property relating to Products. Supplier shall upon
> execution of this Agreement transfers and assigns to Company free of any claims
> or encumbrances all rights and interest in the Intellectual Property of "Glutadose",
> "Glutadose Wellness", "Glutadose Guard" and "Glutadose Immune", and all related
> assets pertaining or related to the foregoing brands, product formulas, tradenames
> and/or trademarks, including without limitation, trademarks, tradenames, domain
> names, websites, registrations (domestic and international), codes, passwords,
> filings, applications, and all marketing and/ or advertising assets and materials
> (collectively the "Glutadose IP Assets"). To the best of Supplier knowledge, no
> other person lawfully claims any right or interest to the Glutadose IP Assets. With
> respect to Global Trade Item Number (GTIN) (UPC or barcodes) currently being
> used in GlutaDose products, Company will continue to use Supplier's GTIN up
> until Company decides otherwise, Supplier will ensure that GTIN subscription fees
> as it relates to GlutaDose products are kept in good standing. As further
> consideration for the purchase of the foregoing Glutadose IP Assets, Company shall
> pay Supplier $25,000.00 which shall be included in the first Purchase Order of the
> first Lot. Supplier represents that it owns the Glutadose IP Assets free of any claims
> or encumbrances and has the right to sell and convey same. Supplier further
> covenants that it will not produce or manufacture any product bearing the name
> "Glutadose" (except for the Company) or infringe on the Intellectual Property of
> the Company, including the Glutadose IP Assets. Supplier will cooperate with the
> Company in providing any other documentation, items, information or data
> reasonably necessary for the Company to conduct business seemingly utilizing the
> Glutadose IP Assets. Any and all Intellectual Property related to GlutaDose
> products that is owned by Supplier and/ or its Affiliates will be transferred to
> Company.

MSAPA § 3. The MSAPA is governed by, construed, and enforced in accordance with the

substantive law of the State of Florida, irrespective of its conflict of law provisions. MSAPA § 8.7.

A supplemental Declaration dated on January 13, 2023 by Alan Petro, CEO of New Vision, states,

"[w]hile New Vision retained the right to manufacture similar products for other parties, the

[MSAPA] restricted the manufacture of products bearing the GLUTADOSE trademark for

---

[5] The MSAPA was filed under seal. A redacted version is filed on the docket at ECF No. [63-7].
[6] The MSAPA refers to New Vision as "Supplier" and to Defendant as "Company." ECF No. [66-3] at 2.

Nutradose, as Nutradose is now the sole owner of the GLUTADOSE Trademark." Petro Suppl. Decl. ¶ 10, ECF No. [74-3].

### 7.    Trademark Assignment

On December 7, 2021, New Vision recorded an assignment of the GLUTADOSE mark to Plaintiff with the U.S. Patent and Trademark Office. Trademark Assignment at 2-4, ECF No. [63-8]. The Trademark Assignment provides that "Assignor does hereby . . . assign . . . Assignor's entire right, title and interest in and to the Mark . . . including all claims for damages by reason of past, present or future infringement or other unauthorized use[.]" Trademark Assignment at 3.

### 8.    Defendants' Advertising

- ***www.biodosepharma.com***

On December 21, 2022, Bio Dose's website, www.biodosepharma.com ("biodosepharma.com"), loaded images of three products which Bio Dose had in its inventory. ECF No. [61-10]. Cropped screenshots of the website are below:





Case No. 22-cv-20780-BLOOM/Otazo-Reyes



*Id.* The bottom of the webpage included the header "SALES POINTS & TRADEMARK DISCLAIMER." *Id.* Below that header, the website contained the following statement: "GLUTADOSE is a registered trademark of NUTRADOSE LABS LLC. BIO DOSE PHARMA, LLC, the marker of the present advertising, is in [sic] not affiliated with NUTRADOSE LABS LLC." ECF No. [61-10].

The biodosepharma.com website linked to the @glutadose account as late as mid-2021. Pl.'s SMF ¶ 40; Defs.' CSMF ¶ 40. The parties dispute whether the website linked to that account until September 1, 2022. Pl.'s SMF ¶ 40; Defs.' CSMF ¶ 40.

- ***www.glutactive.com***

Bio Dose ships and sells a product that competes with GlutaDose Products, GlutActive, through its website, Walmart, Amazon, other online sites such as Shopfly, and directly to resellers. Pl.'s SMF ¶ 25; Defs.' CSMF ¶ 25.

As of December 21, 2022, Bio Dose possessed a website, https://www.glutactive.com ("glutactive.com"), that included a page entitled About Raimundo Santamaria. Pl.'s SMF ¶ 35;

Defs.' CSMF ¶ 35. The webpage mentioned GlutaDose seven times and repeatedly describes Santamarta as the creator and founder of GlutaDose and GlutActive, and recounts Santamarta's personal experiences in using GlutaDose to treat himself after he was diagnosed with Covid-19. Pl.'s SMF ¶ 35; Defs.' CSMF ¶ 35. The website does not contain any statement that Bio Dose is not an authorized reseller or distributor of GlutaDose Products. Pl.'s SMF ¶ 38. No GlutaDose Products were sold on glutactive.com. Defs.' CSMF ¶ 38. Another webpage in the glutactive.com domain, an "About Us" page, similarly describes Santamarta as the creator of GlutaDose. Pl.'s SMF ¶ 36; Defs.' CSMF ¶ 36.

- ***GlutActive Inserts***

Defendants inserted promotional marketing materials and samples of GlutActive into shipping boxes for customers who purchase GlutaDose Products from Bio Dose. Pl.'s SMF ¶ 50; Defs.' CSMF ¶ 50.

- ***Metatags***

The parties dispute whether Bio Dose has used metatags of photos or images of GlutaDose Products in search engines such as Google and Bing that direct search engine users to biodosepharma.com. Pl.'s SMF ¶ 41; Defs.' CSMF ¶ 41.

**9.    Registrations of the GLUTADOSE Mark in Foreign Countries**

The record reflects that the GLUTADOSE mark was registered in Mexico, the Dominican Republic, and in the European Union. One document from the *Ministerio de Industria, Comercio y Mipymes, Oficina Nacional de le Propiedad Industrial* of the Dominican Republic is titled "DIRECCIÓN DE SIGNOS DISTINTIVOS CERTIFICADO DE REGISTRO DE MARCA DENOMINATIVA" and identifies Raimundo Santamarta as the Titular of GLUTADOSE. ECF No. [61-3] 410-13. Another document from the *Instituto Mexicano de la Propiedad Industrial* titled "TÍTULO DE REGISTRO DE MARCA" associates Raimundo José Santamarta Devis with

the *signo distintivo* GLUTADOSE. *Id.* at 414-20. A third document from the European Union
Intellectual Property Office is a certificate of registration for the trademark GLUTADOSE that is
associated with the number 018519708. *Id.* at 423. A fourth document generated on January 6,
2022 identifies Raimundo Santamarta Devis as the owner of the GLUTADOSE mark associated
with the application number 018519708. *Id.* at 434-35.

      **10.**    **Other Use of the GLUTADOSE Mark on the Internet**

      This dispute also concerns uses of the GLUTADOSE mark by Defendants on the internet
beyond their use on Defendants' websites. The parties agree that "Nutradose owns and controls
the Amazon Brand Registry registration for GLUTADOSE." Defs.' SMF ¶ 69; *see also* Pl.'s
CSMF ¶ 69. Bio Dose's "Google address registration does not reference GLUTADOSE." Defs.'
SMF ¶ 72; *see also* Pl.'s CSMF ¶ 72. "GLUTADOSE is associated with the Nutradose address."
Defs.' SMF ¶ 73; *see also* Pl.'s CSMF ¶ 73. Finally, Bio Dose does not presently own or control
the Instagram accounts @glutadose or @glutadose.es. Defs.' SMF ¶ 51; *see also* Pl.'s CSMF ¶ 51.

      Regarding the Instagram accounts, the Declaration of Alejandro Gonzalez ("Gonzalez
Declaration"), a manager, member, and Chief Financial Officer of Nutradose, states that
Defendants closed the @glutadose.es account, resulting in the loss of 5,181 Instagram followers,
and Defendants deleted the contents posted on that account. Gonzalez Decl. ¶ 40, ECF No. [61-2].
The Gonzalez Declaration also states that Defendants named the @glutadose account
@glutaactivevevzla and deleted the posted Glutadose content. *Id.*

    **II.**    **LEGAL STANDARD**

      A party may obtain summary judgment "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). An issue is genuine if "a reasonable trier of fact could return judgment for the non-
moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th

Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Further, the Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

### III.    DISCUSSION

### A. Defendants' Motion

### 1. Standing

#### a. *Assignment in Gross*

Defendants submit that New Vision's assignment to Plaintiff of the GLUTADOSE mark is invalid because New Vision did not assign the goodwill associated with that mark. ECF No. [66-1] at 16. In support of their argument, Defendants cite to Section 3 of the MSAP Agreement, which governs the mark assignment, to show that New Vision did not transfer the goodwill. Defendants further argue that New Vision's continued manufacture of, and control over the quality of, the GlutaDose Products further confirms the goodwill was not transferred. *Id.* at 16-17 (citing *Vital Pharm., Inc. v. Monster Energy Co.*, 472 F. Supp. 3d 12377, 1268 (S.D. Fla. 2020)). Defendants contend that the Trademark Assignment filed contemporaneously with the U.S. PTO did not transfer the goodwill either, despite providing for that transfer. Defendants argue only New Vision executed the assignment, and the transfer is inconsistent with the MSAP Agreement. *Id.* at 17.

Plaintiff responds with two primary arguments. First, the MSAP Agreement, when read as a whole and in conjunction with the contemporaneously executed Transfer Assignment, demonstrates that the parties to those agreements intended for Plaintiff to obtain the goodwill. ECF No. [74-1] at 7-9. Plaintiff asserts the Trademark Assignment is not defective, and Defendants have no standing to challenge whether the parties to that agreement failed to follow assignment formalities. *Id.* at 9-10. Second, a trademark assignment need not recite "magic word[s]" for an assignment to be valid. Rather, the Eleventh Circuit requires simply that Plaintiff continue to use the mark solely in connection with goods that (1) generated the goodwill associated with that mark; and (2) meet the assignor's quality control standards for those goods. *Id.* at 10-12. Plaintiff points

out that New Vision continues manufacturing GlutaDose Products solely for Nutradose and is not selling those products to anyone else. *Id.* at 11-12.

Defendants reply that the MSAP Agreement contains a full integration clause, ECF No. [89-1] at 5-6 (citing MSAPA §§ 8.4 and 8.6). Moreover, Section 5.9 of the MSAPA, a provision on which Plaintiff relies to show that the MSAPA parties intended for Defendant to receive the goodwill, is irrelevant because Defendant had no goodwill to license back to New Vision. *Id.*

The transfer of a trademark without "the attendant good-will of the business which it represents" is generally an invalid "'in gross' transfer of rights." *Int'l Cosms. Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) (quoting *Berni v. Int'l Gourmet Rest. of Am.*, 838 F.2d 642, 646 (2d Cir. 1988)).[7] Nevertheless, a trademark transfer need not be accompanied with the transfer of any tangible assets. *Int'l Cosms.*, 303 F.3d at 1246. The assignment-in-gross rule "aims to prevent consumer deception caused when an assignee alters the quality of goods under the same mark." *Heron Dev. Corp. v. Vacation Tours, Inc.*, No. 16-20683-CIV, 2017 WL 5957743, at *5 (S.D. Fla. Nov. 30, 2017) (citing *In re XMH Corp.*, 647 F.3d 690, 696 (7th Cir. 2011)). "Use of the mark by the assignee in connection with a different good will and different product may result in a fraud on the purchasing public, who reasonably assume that the mark signifies the same nature and quality of goods or services, whether used by one person or another." *Id.* (citation omitted). As such, the rule ensures "the assignee's use of the mark will not be deceptive, and will not break the continuity of the thing symbolized by the assigned mark." 3 *McCarthy on Trademarks and Unfair Competition* § 18:3 (5th ed.).

---

[7] "Good will" is "a business value that reflects the basic human propensity to continue doing business with a seller who has offered goods and services that the customer likes and has found adequate to fulfill her needs." 1 *McCarthy on Trademarks and Unfair Competition* § 2:17 (5th ed.).

According to its express terms, the MSAPA is governed by Florida law. MSAPA § 8.7. Under Florida law, the "polestar guiding the court in the construction of a written contract is the intent of the parties." *Crastvell Trading Ltd. v. Marengere*, 90 So. 3d 349, 353 (Fla. 4th DCA 2012). "To determine the intent of the parties, a court should consider the language in the contract, the subject matter of the contract, and the object and purpose of the contract." *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 197 (Fla. 1992). Further, courts are to "read provisions of a contract harmoniously in order to give effect to all portions thereof." *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000); *see also Lalow v. Codomo*, 101 So. 2d 390, 393 (Fla. 1958) ("The intention of the parties must be determined from an examination of the whole contract and not from the separate phrases or paragraphs.") (internal citation omitted).

Because the parties intended that Nutradose distribute GlutaDose Products, it follows that the intent of the parties to the MSAPA was necessarily to transfer the goodwill of the GLUTADOSE marks with those marks. The MSAPA's recitals provide that Plaintiff engages in the marketing and sale of "dietary and/or nutritional supplements, including the Product(s)," which the agreement defines as "vitamins or supplements . . . sold or manufactured . . . under the trade name or label of 'Glutadose Wellness' or 'Glutadose Guard' or 'Glutadose Immune'." MSAPA at 2, 3. The MSAPA also contains a recital that explains that Nutradose "wishes to contract [New Vision] to manufacture certain of the [Nutradose] Product(s) and [New Vision] desires to manufacture the Company Product(s)." *Id.* at 2. The agreement provides that New Vision "shall . . . transfer[] and assign[] to [Nutradose] . . . all rights and interest in the Intellectual Property of 'Glutadose', 'Glutadose Wellness' or 'Glutadose Guard' and 'Glutadose Immune', and all related assets pertaining or related to the foregoing brands, product formulas, tradenames and/or trademarks[.]" *Id.* at 8. Thus, the subject matter, object and purpose of the agreement are to enable

Nutradose to market and sell the products that were previously associated with the GlutaDose marks. Given that the agreement concerns products associated with the GLUTADOSE mark, it follows that Section 3 of the MSAPA facilitates the sale and marketing of those products by providing for the transfer of "***all related assets*** pertaining to . . . [the] tradenames and/or trademarks." MSAPA § 3. Thus, the goodwill associated with the GlutaDose marks is among the "related assets" transferred under Section 3 of the MSAPA. Otherwise, the intended purpose of the contract would be frustrated because Nutradose would not be allowed to distribute GlutaDose Products. As such, it was unnecessary to specify expressly that goodwill was transferred with those marks. *See Int'l Cosms. Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002) (finding that the agreement assigning the "FAIR&WHITE" trademark also assigned the associated goodwill where the agreement indicated that the distributor would continue to market and distribute the same products that were previously associated with that mark). Because the agreement allows the continued distribution of GlutaDose "Product(s)," absent evidence that Nutradose altered the quality of those products, the policy concerns addressed by the assignment-in-gross rule are not present in this case. *See Heron Dev. Corp.*, 2017 WL 5957743, at *5.

Because the Court concludes the MSAPA transferred goodwill, contrary to Defendants' assertion, *International Cosmetics*—a case where the Eleventh Circuit found the agreement there impliedly transferred goodwill—is on point. *See* ECF No. [89-1] at 5-6. For that same reason, the Court does not address Defendants' other arguments, which assume the MSAPA did not transfer goodwill. The Court is also unpersuaded by Defendants' assertion that the MSAPA "deceives the consumer as to the course and quality control of the product," *id.* at 6, because Defendants provide no evidentiary or legal support for that conclusory remark.

### b. *Naked License*

Defendants argue a certain provision in the MSAPA, Section 7, is a "naked license" that forfeits Plaintiff's rights to the GLUTADOSE mark because Plaintiff does not exercise control over the nature and quality of the manufactured GlutaDose Products. ECF No. [66-1] at 18-19 (citing *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519 (11th Cir. 1992)). Specifically, Defendants assert that the MSAPA shows that New Vision, not Nutradose, sets quality standards for the GlutaDose Products. *Id.* at 18. Plaintiff responds that Defendants' argument is not one of standing but one of abandonment, an affirmative defense which must be pleaded. ECF No. [74-1] at 12. Plaintiff points to Sections 2.10.5.2 and 2.10.5.3 of the MSAPA to show that Plaintiff retains control over the quality of the products bearing the GLUTADOSE mark. *Id.* at 12-13. Plaintiff also points to the Petro and Gonzalez supplemental Declarations to argue that Plaintiff exercises its own quality control with respect to the GlutaDose Products. *Id.* at 13-14. Finally, Plaintiff submits that Defendants fail to show that Nutradose intended to abandon its trademark rights. *Id.* at 14 (citing *Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.*, 2016 WL 8710034, at *9 (S.D. Fla. Sept. 12, 2016)). Defendants reply that Sections 2.10.5.2 and 2.10.5.3 of the MSAPA do not refer to quality control over the products manufactured under the GLUTADOSE mark but are mere record-keeping requirements. ECF No. [89-1] at 6.

The Eleventh Circuit in *Mini Maid* explained that "the law imposes a duty upon a licensor . . . to supervise a licensee's use *of the licensor's own trademark*." *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1519 (11th Cir. 1992) (citation omitted) (emphasis in original). "Such a duty . . . derives from the Lanham Act's abandonment provisions, which specify that a registrant's mark may be canceled if the registrant fails to control its licensees' use of the licensed mark." *Id.* However, the Eleventh Circuit has also explained that a defendant who contends that

the plaintiff has abandoned a mark must also show that the plaintiff *intended* to abandon the mark. *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1180 (11th Cir. 1994).

The MSAPA provides that New Vision "shall manufacture the Products [] in accordance with the Product(s) Specification, (b) in material compliance with this Agreement, and all other Applicable Law and (c) in a professional and workmanlike manner, . . . ." MSAPA § 2.2. New Vision is required to advise Nutradose of any material change to "the Manufacturing process or Specifications from time to time during the term of the Agreement." *Id.* The MSAPA further provides that Nutradose shall select the provider and vender of the raw materials for the Active Pharmaceutical Ingredients. *Id.* § 2.5.4. In a section headed "Quality Assurance," the MSAPA imposes on New Vision a requirement to generate "detailed Manufacturing records detailing all aspects of the manufacturing process," and calls for a yearly audit of those records. *Id.* §§ 2.10.5.2 and 2.10.5.3. The MSAPA requires New Vision to "at least meet generally accepted standards of quality control in its packaging." *Id.* § 2.10.5.4. That evidence supports Plaintiff's intention to maintain supervisory control of the manufacturing process. As such, Plaintiff has not abandoned the GLUTADOSE mark by failing to ensure the quality of the GlutaDose Products that New Vision manufactured. *See Living Color Enterprises, Inc. v. New Era Aquaculture, Ltd.*, No. 14-62216-CIV, 2016 WL 8710034, at *9 (S.D. Fla. Sept. 12, 2016) (rejecting defendants' argument in their motion for summary judgment that the plaintiff granted it a naked license where defendants failed to show an intent by plaintiff to abandon the mark at issue). As such, the Court need not address whether Plaintiff adequately supervised New Vision's quality control of the GlutaDose Products.

Accordingly, summary judgment is not warranted on Counts I, II, or III on the grounds that Defendant granted New Vision a naked license.

### c. *Standing to Assert Any Conduct or Agreement Prior to the Date of Assignment*

Defendants argue that Plaintiff only has standing to sue for trademark infringement after December 17, 2021, the date of New Vision's assignment of the GLUTADOSE mark to Defendants. ECF No. [66-1] at 19. Specifically, Defendants assert Plaintiff has no rights to sue for infringement occurring before the date of assignment because the MSAPA does not expressly assign claims before that date, *id.* at 20, relying on, *inter alia*, *Sanchez v. Hacienda Records & Recording Studio, Inc.*, CIV.A. H-11-3855, 2015 WL 1219651 (S.D. Tex. Mar. 17, 2015). In *Sanchez*, an owner to a copyright to a song sued defendants for recording and distributing that song, asserting claims for copyright infringement, breach of contract, and fraud. *Sanchez*, 2015 WL 1219651, at *1. Plaintiff's counsel held rights to several of the plaintiff's songs, including the song at issue in the case. *Id.* Pursuant to the assignment agreement between the plaintiff and plaintiff's counsel, the plaintiff assigned "any and all rights" in the song at issue before plaintiff filed suit. *Id.* at *2. Defendants argued that plaintiff lacked standing to sue for breach of contract because the plaintiff transferred all his rights to the plaintiff's counsel before bringing suit. *Id.* at 4. The court concluded that plaintiff lacked standing to assert breaches of contract accruing between the time that the plaintiff transferred the copyright in the song at issue until the time the plaintiff filed suit because plaintiff had transferred "any and all rights" in the song. *Id.* at *5. However, the court also determined that the plaintiff had standing to sue on claims accruing prior to the assignment because he had not expressly transferred past claims to the plaintiff's counsel. *Id.* Similarly, Defendants argue that New Vision had not expressly assigned past claims of trademark infringement to Defendants, so that New Vision, not Plaintiff, has standing to sue Defendants for trademark infringement. ECF No. [66-1] at 19.

Plaintiff specifically cites to the Trademark Assignment to argue that it assigned claims arising prior to the assignment date. ECF No. [74-1] at 14-15.

Although Defendants are correct that the MSAPA does not assign to Plaintiff claims for infringement that predate the date of assignment, the inquiry does not end there. As correctly pointed out by Plaintiff, the Trademark Assignment, which was recorded with the U.S. Patent and Trademark Office, expressly assigned past claims of infringement. The Trademark Assignment provides that "Assignor does hereby . . . assign . . . Assignor's entire right, title and interest in and to the Mark . . . including all claims for damages by reason of past, present or future infringement or other unauthorized use[.]" Trademark Assignment at 3. Moreover, the Trademark Assignment is valid because, under the Lanham Act, "a recorded assignment is prima facie valid as to form, and the burden is on the challenging party to prove that there is something amiss." *3 McCarthy on Trademarks and Unfair Competition* § 18:11 (5th ed.); *see also* 15 U.S.C. § 1060 (a)(3) ("[W]hen the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office, the record shall be prima facie evidence of execution."); *Sonic Distributors, Inc. v. International Battery, Inc.*, 175 U.S.P.Q. 255, 1972 WL 17798 (T.T.A.B. 1972) ("recordation of an assignment in the Patent Office is prima facie evidence of execution. Since there is no rebuttal of the assignment, petitioner must be considered the owner of the registrations which it has pleaded."). Defendants have not pointed to evidence that calls into question the Trademark Assignment. Because the Trademark Assignment expressly assigned past claims of infringement, *Sanchez* does not support Defendants' argument. Instead, *Sanchez* undermines that argument because the Trademark Assignment contains express language that assigns claims of trademark infringement that predate the date of assignment that the court in *Sanchez* found lacking in the assignment agreement in that case. *Sanchez*, 2015 WL 1219651, at *5. As such, Plaintiff has standing to sue for trademark infringement prior to December 7, 2021.

### 2.   First Sale Doctrine/Exhaustion Defense

Defendants move for summary judgment on Counts I, II, and III on the grounds that the exhaustion defense shields their sales of GlutaDose Products from liability. They assert they sold genuine GlutaDose Products purchased directly from Unipharma, a New Vision reseller,[8] an activity the first sale doctrine protects. ECF No. [66-1] at 22. Defendants acknowledge that the first sale doctrine does not protect a defendant who sells a trademark product that has been materially altered in a manner that adversely affects the goodwill in the product. ECF No. [66-1] at 24. Accordingly, Defendants argue they never materially altered the GlutaDose Products because there is no evidence that they added, modified, or altered the expiration dates on GlutaDose Products, or that Defendants sold any expired GlutaDose Products. *Id.* at 24-25. Defendants also argue their advertising of the genuine GlutaDose Products does not constitute infringement. ECF No. [66-1] at 22-24.

Plaintiff responds that Defendants sold genuine GlutaDose Products. Specifically, Plaintiff incorporates arguments in their Motion for why Defendants' exhaustion defense fails. ECF No. [74-1] at 18; *see also* ECF No. [60] at 29-34. Those arguments are that the first sale doctrine does not apply because (1) Defendants, as former licensees, lacked exhaustion rights on account of their status as former licensees and they did not contract for post-termination "sell off" rights in the Trademark License Agreement with Unipharma;  (2) Defendants altered the GlutaDose Products "by improperly inserting advertisements for their competing product into the shipping boxes for GlutaDose Products and misrepresenting to the recipients that their competing product was superior and implying that it was replacing GlutaDose", (3) Defendants' sale of GlutaDose Products failed to comport with Defendant's quality control standards, (4) Defendants used the

---

[8] As stated in the Court's recitation of the Material Facts, the parties dispute whether Alchemy was an authorized reseller for New Vision. Pl.'s SMF ¶ 26-30; Defs.' SMF ¶ 35, 61.

GlutaDose Products to market a competing product, creating confusion; and (5) Defendants' sales of the GlutaDose Products went "well beyond the mere stock and resale." ECF No. [74-1] at 18-20.

Moreover, Plaintiff contends that the first sale doctrine does not apply because Defendants' websites went "well beyond 'merely providing information'" on the GlutaDose Products and instead impermissibly used pictures or images of the products. *Id.* at 20. Further, Defendants ignore how the internet metatags in images of the GlutaDose Products linking to Defendants' website create a false association between themselves and Nutradose. *Id.* at 20.

Defendants reply that Plaintiff "ratified that the product purchased by BioDose was subject to the first sale rule," its use of the GLUTADOSE mark and GlutaDose Products on biodosepharma.com is protected by the nominative fair use doctrine, and Plaintiff has not presented evidence that Defendants' customers have altered the expiration date on GlutaDose Products sold to them. ECF No. [89-1] at 9. Defendants further argue that Plaintiff has not set forth quality control standards that allow it to know whether resellers have altered the expiration date of the GlutaDose Products that they sell. *Id.*

The Lanham Act aims to protect both consumers and registered trademark owners by preventing consumer confusion over the quality and nature of those products through ensuring that (1) all products sold under a registered mark retain the same "special characteristics" that consumers expect from products associated with that mark and that (2) others do not erode the goodwill in a registered trademark that an owner has spent time, energy and money developing by changing those characteristics. *See id.* Generally, "[t]he resale of genuine trademarked goods generally does not constitute [trademark] infringement." *See Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1301 (11th Cir. 2001). "This is for the simple reason that consumers are not

confused as to the origin of the goods: the origin has not changed as a result of the resale." *Id.* (citing *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998)). Under the first sale doctrine, also known as the exhaustion defense, "the trademark protections of the Lanham Act are exhausted after the trademark owner's first authorized sale of that product." *Id.* (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 301 n.4 (3d Cir. 1998); *Enesco*, 146 F.3d at 1085; *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1447-48 (11th Cir. 1998)). Thus, subsequent sales of a genuine product without a registered trademark owner's consent do not violate the Lanham Act. *Id.*

With those principles in mind, the Court first addresses Plaintiff's former licensee argument because the resolution of that issue determines whether the first sale doctrine applies. The Court then turns to the parties' arguments concerning the material difference exception to the exhaustion defense.

### a. "Sell off" Rights

Plaintiff argues that Defendants cannot avail themselves of the first sale doctrine because they are former licensees of an agreement with Unipharma, the Trademark License Agreement, who did not contract for the right to sell off their inventory of GlutaDose Products following the termination of that agreement. ECF No. [60] at 29 (citing *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 154 (3d Cir. 1984)). Defendants do not address this argument in their Reply.

Plaintiff does not direct the Court to—nor does the Court find—Eleventh Circuit precedent addressing whether a former licensee of a trademark licensing agreement may liquidate its inventory in a trademarked good that is covered by that agreement following its expiration or termination. Instead, Plaintiff relies on *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152 (3d Cir. 1984). In that case, the plaintiff sought a preliminary injunction against defendant, contending that the defendant was making unauthorized use of the Bill Blass marks in connection with the sale of goods after the

expiration of two license agreements that granted the defendant the right to use those marks: the "Men's License" and the "Women's License." *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 153 (3d Cir. 1984). The defendant asserted that the license agreements allowed it to sell off inventory bearing the plaintiff's marks over an indefinite period. *Id.* at 154. Pertinent here, the Men's License contained no express provision covering post-expiration liquidation of inventory bearing the Bill Blass. *Id.* The Third Circuit affirmed the district court's conclusion that the defense was not likely to be successful at a final hearing. *Id.* at 155. The Third Circuit reasoned that the absence of a post-termination sell-off provision in the Men's License meant the licensee undertook the risk that it would be unable to sell its inventory in the trademarked goods following the termination of the licenses. *Id. Bill Blass* does not articulate why the Third Circuit allocated the risk to the licensee rather than the licensor, but that allocation follows from the practical concern that, if a former licensee were permitted to sell off its inventory over an indefinite period after termination of a license, the terms of a license "would have little force or meaning." 4 *McCarthy on Trademarks and Unfair Competition* § 25:31 (5th ed.) (quoting *Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369, 385 (S.D.N.Y. 2000)). That is because a licensee could create a large surplus prior to the expiration or termination of a license and give itself a de facto extension of that license. *Id.*

Here, the September 13, 2019 Trademark License Agreement between Unipharma and Bio Dose authorized Bio Dose to use the GlutaDose trademark. Pl.'s SMF ¶ 9; Defs.' CSMF ¶ 9. On December 7, 2020, Unipharma filed for bankruptcy, and the bankruptcy court approved the December 7, 2020 Asset Purchase Agreement between Unipharma and New Vision. Pl.'s SMF ¶ 10, 12, 14; Defs.' CSMF ¶ 10, 12, 14. The Asset Purchase Agreement provides that the "Sellers," including Unipharma, "shall . . . terminate all prior arrangements or agreements . . . between each of the Sellers and BioDose[.]" Asset Purchase Agreement § 6.12, ECF No. [1-2] at 59. That Agreement also provides that the Sellers shall "use commercially reasonable efforts to enter into

a new Contract in writing between Unipharma and BioDose," but the record does not contain any such contract. *Id.* However, the record contains evidence that Unipharma and New Vision continued to sell GlutaDose Products to Bio Dose after the termination of the Trademark License Agreement. That evidence seemingly demonstrates that the parties agreed that Bio Dose would continue to distribute GlutaDose Products. Given this evidence, a fact dispute exists as to whether Bio Dose continued to be a licensee as of December 7, 2020. If Bio Dose was not a licensee as of the date of the Court Ordered Sale, Bio Dose was not authorized to sell its inventory of GlutaDose Products obtained from Unipharma prior to the termination of the Trademark License Agreement on December 7, 2020.

By the same token, a fact question remains concerning the GlutaDose Products that Bio Dose obtained *after* the termination of the Trademark License Agreement. Unlike the inventory of GlutaDose Products that Defendant possessed as of December 7, 2020, Bio Dose did not obtain those goods subject to that agreement. However, the issue remains as to whether Bio Dose's post-December 7, 2020 purchases were authorized. *See Davidoff*, 263 F.3d at 1301 (explaining that the first sale doctrine applies after "the trademark owner's first **authorized** sale of that product" (emphasis added)); *see also Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 382 (S.D.N.Y. 2000) (quoting *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 979 F. Supp. 224 (S.D.N.Y. 1997)) ("It is well settled that sale of genuine goods without authorization by the trademark holder generally will not constitute trademark infringement . . . Such cases, however, usually arise when the initial sale of the trademarked goods was authorized, and the second or subsequent sale is contested.").

For instance, Defendants obtained GlutaDose Products from sources other than Plaintiff. The Santamarta Declaration states, and Perez testified, that Bio Dose purchased GlutaDose

branded products from Alchemy Valley, LLC, who purchased those products from New Vision. Santamarta Decl. ¶ 30; Perez Dep. at 27:3-6, 88:13-15. The parties dispute whether Alchemy was authorized to purchase GlutaDose Products from New Vision. Pl.'s SMF ¶ 26-30; Defs.' SMF ¶ 35, 61. In Plaintiff's view, New Vision's sales of GlutaDose Products to Alchemy were unauthorized because Alchemy deceptively acted as a "strawman" for Defendants, purchasing the products and allowing Defendants to obtain GlutaDose Products that they would otherwise not have been able to obtain from New Vision, and that if New Vision knew Alchemy was reselling its products to Bio Dose, it would not have sold any GlutaDose Products to Alchemy in the first place. *See* Pl.'s SMF ¶¶ 29, 30; *see also* Petro Decl. ¶ 26, ECF No. [61-1]. Defendants argue Alchemy had purchased GlutaDose Products to resell those products in Colombia, but when Unipharma entered into bankruptcy, Alchemy's plans were frustrated and Alchemy responded by selling its GlutaDose Products inventory to Bio Dose to recover their "lost money." ECF No. [75-1] at 17:6-18; Perez Dep. at 90:18-23. As such, the Court is unable to conclude, as a matter of law, that Alchemy's purchase of GlutaDose Products were authorized.

In addition, a packing slip in the record shows that Unipharma sold certain quantities of "Glutadose Guard 10ml 6 ct" and "Glutadose Guard 10ml 12 ct" in February 2021, almost two months after the Court Ordered Sale. It is unclear from the record how *Unipharma* could authorize the February 5, 2021 sale of GlutaDose Products when New Vision had acquired the entire GlutaDose line of business and intellectual property in the Court Ordered Sale from Unipharma. *See* Pl.'s SMF ¶ 12; Defs.' CSMF ¶ 12.

Moreover, the parties dispute whether New Vision sold GlutaDose Products directly to Bio Dose. Plaintiff asserts New Vision did not supply or sell to Bio Dose any GlutaDose Products.

Pl.'s SMF ¶ 22; *see also* Petro Decl. ¶¶ 19-21, ECF No. [61-1]; Perez Dep. at 27:1-6.[9] Defendants cite to a document showing amounts Bio Dose owed to New Vision that Bio Dose paid to New Vision on May 27, 2021, five months after New Vision acquired the GLUTADOSE mark. ECF No. [61-4] at 311. Perez testified that those payments related to amounts due to New Vision for transportation costs relating to a "last shipment." Perez Dep. at 54:22-56:2. As such, the Court cannot rule as a matter of law that sales of GlutaDose Products obtained directly from New Vision are protected by the first sale doctrine.

### b. *Material Difference Exception*

Although the Court has determined that summary judgment is not warranted on Counts I through III due to Defendants' exhaustion defense, it addresses Defendants' arguments concerning the material difference exception as those arguments are repeated in Plaintiff's Motion. Defendants argue that the first sale doctrine bars Plaintiff's claims under the Lanham Act because Bio Dose sold genuine GlutaDose Products directly from Unipharma and New Vision without materially altering those products. ECF No. [66-1] at 22. In support, Defendants point to the deposition testimony of Santamarta and Perez. *See* Santamarta Dep. at 33:10-34:11; Perez Dep. at 27:1-30;

---

[9] Defendants also argue that the first sale doctrine immunizes a reseller's advertising of genuine, trademarked products on the reseller's website or on social media from claims of trademark infringement, relying on the reasoning in *Brain Pharma, LLC v. Scalini*, 858 F. Supp. 2d 1349, 1354 (S.D. Fla. 2012). In that case, the parties did not dispute that "if Defendants were merely reselling Plaintiff's genuine products, the first sale doctrine would bar any trademark infringement claim." *Id.* at 1353. As such, the court in *Brain Pharma* was not presented with the issue raised here of whether Defendants were authorized to continue selling GlutaDose Products following the termination of the Trademark License Agreement. Neither did the court consider any allegations of material alteration of the trademarked goods. As such, *Brain Pharma* does not support Defendants' sweeping assertion that merely selling genuine trademarked goods defeats claims of trademark infringement. Regardless, *Brain Pharma* held that "the mere allegation that [the defendant] misrepresented that it was an authorized [plaintiff's] agent cannot support a trademark infringement claim." *Id.* That case acknowledged that a defendant who intentionally uses a plaintiff's trademarks on its websites may constitute trademark infringement where the websites create a likelihood of confusion as to the source of affiliation of the web site that goes beyond reselling. *Id.* Here, the biodosepharma.com website makes extensive use of the GlutaDose marks, raising a fact question concerning whether Defendants' website creates a likelihood of confusion.

88:22-90:23. Defendants further assert the record is devoid of evidence that Defendants altered the GlutaDose Products, including by adding, modifying, or altering the expiration date on those Products. *Id.* at 24.

Plaintiff responds that Defendants inserted advertisements of GlutActive, a competing product, into the shipping boxes of the GlutaDose Products that it sold to Bio Dose customers. ECF No. [74-1] at 30. According to Plaintiff, those inserts tout the superiority of GlutActive over GlutaDose, and such advertising is relevant to a consumer's decision whether to purchase GlutaDose. As such, the inclusion of those inserts materially alters the GlutaDose Products that Bio Dose sells. *Id.* Plaintiff further contends that Bio Dose does not adhere to Nutradose's quality control standards and this failure creates a material difference in the products Defendants sold. *Id.* at 30-31.

Defendants reply that "there is nothing inherently wrong with promoting other products along with the products that you resell, but in this case the conduct was *de minimis*." ECF No. [89-1] at 10-11.

The Eleventh Circuit has explained that the first sale doctrine does not protect an alleged infringer when the alleged infringer sells trademarked goods that are materially different from those goods sold by the owner of the trademark. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302 (11th Cir. 2001). That is because "a materially different product is not genuine and therefore [the product's] sale constitutes trademark infringement." *Id.* (citing *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 643 (1st Cir. 1992); *Original Appalachian Artworks*, 816 F.2d 68, 73 (2d Cir. 1987); *Iberia Foods*, 150 F.3d at 302-3; *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1302 (5th Cir. 1997); *cf. Enesco*, 146 F.3d at 1087). For that reason, the resale of trademarked products that are materially

different from the trademark owner's products can constitute trademark infringement. *Id.* A "material difference" is one that consumers consider relevant in deciding whether to purchase a product. *Id.* The threshold of materiality is low and may include "subtle differences between products." *Id.*

For instance, a trademarked good may be materially altered if a defendant defaces a good. *See Davidoff*, 263 F.3d at 1302-1303 (noting that defendant etched glasses of bottle of fragrances to remove batch code markings). A trademarked good may also be materially altered if a reseller removes the good from its original packaging and repackages that good in packaging that is not approved by the trademark owner's quality controls, and removes the warranty information from a good, invalidating the warranty. *TracFone Wireless, Inc. v. Pak China Grp. Co.*, 843 F. Supp. 2d 1284, 1298 (S.D. Fla. 2012). Other examples of materially altering a good include adding markings on batteries (e.g., a "Not for Retail Trade" designation) while removing "safety information, safe handling instructions, and other warnings," in addition to replacing the packaging of those batteries, *Energizer Brands, LLC v. My Battery Supplier, LLC*, 529 F. Supp. 3d 57, 62 (E.D.N.Y. 2021); altering the "boxes, wrappers and trays" of various chocolate assortments, *Nestle*, 982 F.2d at 643; and an importer and distributor importing dolls into the United States with "adoption" papers in Spanish, not English, *Original Appalachian*, 816 F.2d at 73.

Plaintiff's argument is unsupported by caselaw. The cases considering the material difference exception to the first sale doctrine focus on physical alterations to the product, its packaging, or items contained in that packaging. Here, there is no evidence that Defendants defaced the GlutaDose Products, replaced those products' packaging, or removed or replaced marking or paperwork that is packaged with those products.

The record demonstrates that Bio Dose did not materially alter the GlutaDose Products that were resold. However, because there is a question of fact as to whether Bio Dose was authorized to resell GlutaDose in the first place after December 7, 2020, summary judgment is not warranted on Counts I through III on the basis of the first sale doctrine.

### 3.   Defendants' Other Arguments for Summary Judgment on Counts I, II, and III

Defendants seek summary judgment on Plaintiff's allegation that Defendants continue to infringe the GlutaDose mark since December 17, 2021. Compl. ¶ 27, ECF No. [1]. For the reasons that follow, those arguments do not warrant summary judgment on Counts I, II, or III.

#### a.   *Infringement of the GLUTADOSE Mark in Foreign Jurisdictions*

Defendants contend the Asset Purchase Agreement did not transfer Unipharma's rights to the GLUTADOSE mark in Mexico, the Dominican Republic, or the European Union because Unipharma had no rights to those marks. ECF No. [66-1] at 28. Defendants reason that Santamarta owns those marks as he was the first to file for their registration in those countries and New Vision never challenged those foreign registrations. *Id.* at 28-29.

Plaintiff responds that the foreign registrations were property of the Unipharma estate and rely upon Santamarta's deposition testimony and Declaration. ECF No. [74-1]. Conceding that Santamarta is the registrant of the GLUTADOSE marks in the foreign countries, Plaintiff asks the Court to exercise its extraterritorial jurisdiction under the Lanham Act and direct Santamarta to assign the foreign registrations to Nutradose. Defendants reply that the Court should not exercise its extraterritorial jurisdiction because the foreign registrations "have no impact on U.S. commerce" and such exercise would interfere with Mexico, the Dominican Republic, and the countries of the European Union's territorial sovereignty. ECF No. [89-1] at 12-13.

Under the Lanham Act, a defendant is liable for infringement if he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to

cause confusion, or to cause mistake, or to deceive" without consent. 15 U.S.C. § 1114(1). To prevail on a claim of trademark infringement, a plaintiff must show that (1) its trademark has priority and (2) a defendant's mark is likely to cause consumer confusion. *Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).[10] The Lanham Act also forbids "unfair trade practices involving infringement of trade dress, service marks, or trademarks, even in the absence of federal trademark registration." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001) (citation omitted). To prevail on a claim of unfair trade practices, a plaintiff must show (1) that it had "prior rights to the mark at issue" and (2) the defendant "had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Id.* (citation omitted). Accordingly, for Defendants to be liable on Counts I, II, or III for its registration and maintenance of the GLUTADOSE marks in the foreign jurisdictions, Plaintiff must show it owns those marks.

In the United States, ownership goes to the first to use the mark; in most other nations, ownership goes to the first to register the mark. 2 *McCarthy on Trademarks and Unfair Competition* § 16:35 (5th ed.). Defendants assert, and Plaintiff does not contest, that ownership of the GLUTADOSE marks in Mexico, the Dominican Republic, and in nations in the European Union go to the individual who registers the marks first. *See* ECF No. [66-1] at 28-29 (citing *Capital Grille Holdings, Inc. v. Historic Hotels of Nashville, LLC*, 448 F. Supp. 3d 819, 827 (M.D. Tenn. 2020)). The question of who owns the foreign marks thus turns on who was the first to register those marks. Defendants assert that Santamarta registered the GLUTADOSE mark in the foreign countries. Defs.' SMF ¶¶ 63-65. Plaintiff does not meaningfully dispute that Santamarta

---

[10] The analysis of liability under the Florida common law trademark infringement (Count II) is the same as under the Lanham Act. *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004) (citing *Gift of Learning Found., Inc. v. TGC, Inc.,* 329 F.3d 792, 802 (11th Cir. 2003)).

registered the GLUTADOSE mark in those countries but asserts that Santamarta did so on behalf of Unipharma. The record contains no evidence that identifies Unipharma as a registrant of the foreign marks; instead, the evidence shows only that Santamarta registered the GLUTADOSE mark in the foreign jurisdictions. *See* ECF No. [61-3] at 410-13 (identifying Raimundo Santamarta as the owner of the GLUTADOSE mark in the Dominican Republic), 414-20 (identifying Raimundo José Santamarta Devis with GLUTADOSE in Mexico), 434-35 (identifying Raimundo Santamarta Devis as the "Owner" of the GLUTADOSE trademark in the EU). Notwithstanding Santamarta's statements concerning his intent in registering the foreign GLUTADOSE marks, Plaintiff provides no evidence or legal authority to support its ownership of the foreign trademarks under an agency theory of ownership. Nor does Plaintiff provide evidence that Santamarta transferred ownership of the foreign marks to Unipharma. Santamarta's deposition testimony and Declaration do not show that he did so. As such, there is no genuine dispute that Santamarta, not Unipharma, owns the foreign GLUTADOSE marks. Thus, Unipharma could not transfer the foreign marks through the Asset Purchase Agreement. There is therefore no dispute that Defendants are not liable under Counts I, II, and III for maintaining or registering the GLUTADOSE marks in foreign jurisdictions. However, since Defendants' use of the U.S. GLUTADOSE trademark is still at issue, summary judgment is not warranted on Counts I, II or III.

Alternatively, Plaintiff urges the Court to exercise its territorial jurisdiction to direct Santamarta to transfer the foreign marks to Plaintiff. That request, raised in Plaintiff's Response, is inappropriate for the Court to consider in ruling on Defendant's Motion. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999) (citing Fed. R. Civ. P. 7(b) ("application to the court for an order shall be by motion which . . . shall be made in writing, shall state with particularity

the grounds therefor, and shall set forth the relief or order sought.")). Thus, the Court declines to do so.

### b. *Defendants' Use of the Amazon Brand Registry on Amazon.com*

Plaintiff alleges that Defendants infringed the GLUTADOSE mark by registering that mark on the Amazon Brand Registry on Amazon.com and Defendants continue to infringe that mark by controlling the mark on the Amazon Brand Registry. ECF No. [1] ¶ 27(a). In Defendants' Motion, Defendants assert that Bio Dose does not own or control the Amazon brand registration for GLUTADOSE. ECF No. [66-1] at 26 (citing Defs.' SMF ¶ 69). Plaintiff does not dispute that Nutradose presently owns the Amazon Brand Registry for GLUTADOSE but contends BioDose owned the Amazon Brand Registry at the time of the commencement of this action. Pl.'s CSMF ¶ 69. There is therefore no dispute that Defendants do not continue to infringe the GLUTADOSE mark by continuing to use the Amazon Brand Registry on Amazon.com. Nevertheless, because Defendants' past use of the GLUTADOSE mark is still at issue, summary judgment is not warranted on Counts I, II or III.

### c. *Maintaining Bio Dose's Office Location as the Google Search Result When Searching for GLUTADOSE*

Plaintiff alleges Defendants maintained and continues to maintain Bio Dose's office location as the Google search result when searching for GlutaDose. ECF No. [1] ¶ 27(f). Defendants contend that Bio Dose removed GLUTADOSE from its Google address information. Defs.' SMF ¶ 72. Defendants also contend "GLUTADOSE is associated with Nutradose'[s] address." *Id.* ¶ 73. Plaintiff does not dispute GLUTADOSE is presently associated with Nutradose's address but contends that BioDose's Google address improperly referenced GLUTADOSE at the start of this action. Pl.'s CSMF ¶¶ 72, 73. Therefore, there is no dispute that BioDose does not continue to maintain its office location as the Google search result when

searching for GLUTADOSE. Nevertheless, because Defendants' past use of the GLUTADOSE mark is still at issue, summary judgment is not warranted on Counts I, II or III.

### d.   Use of Instagram Accounts

Plaintiff alleges Defendants used and continue to use GLUTADOSE Instagram accounts, i.e., @glutadose and @glutadose.es. ECF No. [1] ¶ 27(e). Defendants contend they do not and have not controlled the Instagram accounts since before Nutradose obtained the GLUTADOSE trademark. ECF No. [66-1]; *see* Defs.' SMF ¶ 51. Plaintiff disputes the timing of Defendants' abandonment of the @glutadose and @glutadose.es accounts, asserting the abandonment occurred circa March 2022, after the December 7, 2021 assignment to Nutradose of the GLUTADOSE marks. Pl.'s CSMF ¶ 50. Nevertheless, because Defendants' past use of the GLUTADOSE mark is still at issue, summary judgment is not warranted on Counts I, II or III.

### e.   Nominative Fair Use

Defendants argue, "as to **27 d, f, e, h, and I** [of Plaintiff's Complaint] and the claims regarding promotion of genuine GLUTADOSE product on sites such as Walmart," that Bio Dose's advertising of its resale of genuine GlutaDose Products does not constitute trademark infringement under the nominative fair use doctrine. ECF No. [66-1] at 27. Plaintiff responds that nominative fair use is an affirmative defense that must be pleaded and Defendants have failed to do so here. ECF No. [74-1] at 21. Plaintiff contends that Defendants went beyond nominative fair use, citing Defendants' website, biodosepharma.com, which is "flooded with images of GlutaDose Products and the GlutaDose design trademark." *Id.* (citing ECF No. [61-10]). In reply, Defendants cite to a case from the Middle District of Florida that followed the Ninth Circuit's approach in not treating the defense as an affirmative defense. ECF No. [89-1] at 8.

Nominative fair use is "a use of another's trademark to identify the trademark owner's goods or services." 4 *McCarthy on Trademarks and Unfair Competition* § 23:11 (5th ed.).

Professor McCarthy suggests that an independent retailer's use of a trademark in its advertisement of a trademark owner's products may qualify as nominative fair use. *Id.* ("e.g. 'We sell genuine GLUGMORE plumbing parts.'"). *Id.* The Eleventh Circuit has not addressed whether nominative fair use is an affirmative defense to trademark infringement claims under the Lanham Act. *Parsons v. Regna*, 847 F. App'x 766, 773 (11th Cir. 2021). The Court need not address that issue because Defendants have not met their burden to show nominative fair use. *See Commodores Ent. Corp. v. Thomas McClary*, No. 614CV1335ORL37GJK, 2015 WL 12843872, at *3 (M.D. Fla. Mar. 10, 2015) (citing *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1182-83 (9th Cir. 2010)) ("The defendant asserting nominative fair use has the burden to show that it used the mark only to refer to plaintiff's goods or services; then the burden shifts back to plaintiff to show a likelihood of confusion under the nominative fair use analysis.").

> To show nominative fair use, Defendants must establish that
>
> (1) [p]laintiff's product or service is not readily identifiable without use of the trademark; (2) [d]efendants used only so much of the mark as is reasonably necessary to identify the plaintiff's product or services; and (3) the user of the mark does nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Parsons,* 847 App'x at 774 (quoting *Commodores*, 314 F. Supp. 3d at 1250) (alterations in original). Defendants' briefing does explain how the use of the GLUTADOSE mark and images of GlutaDose Products on the biodosepharma.com website satisfies the requirements to show that that use is nominative fair use. *See* ECF No. [66-1] at 27. Regardless, Plaintiff argues, *inter alia*, that biodosepharma.com uses more of the GLUTADOSE mark than is reasonably necessary to identify GlutaDose Products. ECF No. [74-1] at 21 (citing ECF No. [61-10]). As the screenshot of the biodosepharma.com website that is pasted in this Order shows, the website is mostly covered with the GLUTADOSE trademark and images of GlutaDose Products. Such an extensive use of the mark and those images raises a fact question on whether it was reasonably necessary for

BioDose to identify GlutaDose Products. Summary judgment on Counts I, II and III is not warranted on the grounds that BioDose engaged in nominative fair use of the GLUTADOSE mark as a matter of law.

### 4. Count V

Defendants contend that Plaintiff's FDUTPA claim, Count V, should be analyzed in the same way as its Lanham Act claims. ECF No. [66-1] at 30. Defendants assert that it has proven the defenses of exhaustion and nominative fair use, so summary judgment should also be granted in its favor on Count V. *Id.* For the reasons previously stated, fact questions remain as to these defenses and summary judgment is not warranted on Count V.

### 5. Count IV

Defendants argue there is no dispute of material fact as to Plaintiff's conversion claim with respect to the Instagram Accounts because Plaintiff made no demand for return of the Instagram sites. Defendants fail to cite any legal authority. Courts in this district have summarily rejected arguments that are unsupported by legal authority. *See, e.g.*, *Goldberg for Jay Peak, Inc. v. Raymond James Fin., Inc.*, 16-21831-CIV, 2017 WL 7791564, at *7 (S.D. Fla. Mar. 27, 2017) (rejecting argument for failure to provide supporting legal authority). Such a failure suggests "either that there is no authority to sustain its position or that [a party] expects the court to do its research." *Id.* (citing *Rapid Transit Lines, Inc. v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970)). The Court declines Defendants' invitation to do their research and summary judgment is denied as to Count V.

### 6. Laches

Defendants assert that "Plaintiff's claims . . . are barred by laches" because Bio Dose continued to sell its inventory of GlutaDose Products after the Court Ordered Sale and Unipharma,

New Vision, and Nutradose raised no challenge to Bio Dose's continued use of the Instagram accounts until Nutradose filed the instant action. ECF No. [66-1] at 32-33.

The defense of estoppel by laches is an equitable defense that may be applied to bar claims for trademark infringement under the Lanham Act. *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997). The Eleventh Circuit requires that a defendant demonstrate three elements to successfully assert the defense: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Id.* (citation omitted).

Defendants do not articulate, nor do the statements of material fact indicate, how Defendants were prejudiced by Plaintiff's delay in bringing suit, assuming there was a delay. Because Defendants fail to make that showing, laches does not bar Plaintiff's claims.

### 7. Attorney Fees

Defendants seek an award of attorney fees on the ground that Plaintiff filed a suit against Defendants "without prior notice and to make claims mischaracterizing nominative fair use in support of legitimate resales of genuine product render [sic] and [mischaracterizing] non-existent rights prior to its assignment of the relevant trademark," making it an "exceptional case" warranting those fees under the Lanham Act. ECF No. [66-1] at 33.

Courts may award attorney fees to the prevailing party under the Lanham Act. 15 U.S.C. § 1117(a). The Supreme Court has explained that "an exceptional case" is one that "stands out from the others" based on either (1) the "substantive strength of a party's litigating position" or (2) the "unreasonable manner in which the case was litigated." *Nakava, LLC v. S. Pac. Elixir Co.*, No. 19-81128-CIV, 2022 WL 17833230, at *4 (S.D. Fla. Dec. 5, 2022), *report and recommendation adopted*, No. 19-81128-CIV, 2022 WL 17830536 (S.D. Fla. Dec. 21, 2022) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014)). The Eleventh Circuit has

explained that the *Octane Fitness* standard applies to cases brought under the Lanham Act. *Tobinick v. Novella*, 884 F.3d 1110, 1116-17 (11th Cir. 2018).

In *Tobinick*, the court held the district court did not abuse its discretion in determining that that case was "exceptional" since the district court had ruled against the plaintiffs in three separate orders regarding whether the defendant's blog posts qualified as commercial speech, the plaintiffs "repeatedly failed to produce new arguments or evidence to distinguish the Court's prior rulings," and belatedly attempted to "inject new issues into the proceedings," specifically by making unsupported allegations of perjury. *Tobinick*, 884 F.3d at 1118-19. In other words, the Eleventh Circuit agreed plaintiffs had acted in bad faith. *See id.* ("The Eleventh Circuit has traditionally interpreted the Lanham Act's exceptional case standard to allow for the award of fees 'only in exceptional circumstances and on evidence of fraud or bad faith.'"). Here, Plaintiff has not filed multiple motions raising issues that the Court has ruled on that fail to produce new arguments or evidence to distinguish those rulings; nor has the Court determined that Plaintiff has made unsupported allegations or similar conduct. Rather than litigating this action in bad faith, Plaintiff has set forth colorable arguments in support of its claims. Such arguments do not make this case an "exceptional" one that warrants attorney fees, especially where the Eleventh Circuit has not decided in a controlling opinion on many of the issues raised in those arguments. *See Tobinick*, 884 F.3d at 119 ("A case will not qualify as exceptional under the Lanham Act merely because one side has zealously pursued or defended its claim, especially on an issue with no directly controlling precedent."). Thus, Defendants are not entitled to attorney fees.

### B. Plaintiff's Motion

Plaintiff advances three primary arguments in its Motion. *See generally* ECF No. [60]. First, Defendants are liable as a matter of law on Counts I, II, III, IV and V based on the undisputed material facts. Second, Defendants' affirmative defenses fail for reasons described more fully below. Third, it is entitled to a permanent injunction against Defendants, a finding that Defendants are liable on all Counts, and Plaintiff is entitled to Defendants' profits and actual damages. The Court addresses Plaintiff's arguments concerning Defendants' affirmative defenses, then considers Plaintiff's arguments on the merits of the Counts in its Complaint, and addresses the relief sought by Plaintiff.

### 1. Affirmative Defenses

#### a. First Sale Doctrine

The Court addresses the parties' arguments regarding Defendants' exhaustion defense because the existence of a fact question would preclude a finding of summary judgment on Counts I, II, and III.

For the reasons stated in the Court's discussion on Defendant's Motion, Bio Dose's status as a former licensee of Unipharma does not preclude the first sale defense. The Court has also determined that Defendants' inclusion of inserts touting the benefits of GlutActive did not materially alter the GlutaDose Products. The Court thus addresses Plaintiff's remaining arguments concerning the first sale doctrine below. Plaintiff contends that the first sale doctrine is inapplicable because the Defendants' sale of GlutaDose Products does not satisfy Nutradose Labs' quality control standards. ECF No. [60] at 30-31. Next, Plaintiff asserts that Defendants' activities went well beyond the "mere stock and resale" of GlutaDose Products, which leads to the likelihood of

consumer confusion and invalidates the exhaustion defense. ECF No. [60] at 32. The Court addresses both of those arguments below.

### i.   *Quality Control Standards*

Plaintiff submits that it maintains quality control standards for GlutaDose Products, Defendants do not enforce those standards when it sells GlutaDose Products to its resellers, and the lack of quality control consstitutes a material difference from the GlutaDose Products that invalidates the exhaustion defense. ECF No. [60] at 30-31. Specifically, Plaintiff maintains that it does not sell GlutaDose Products more than two years after the manufacturing date of the batch of the GlutaDose Products, and Defendants do not exercise control over its resellers to ensure that GlutaDose Products are not sold beyond their batch expiration dates. *Id.* at 31. Plaintiff also contends that some of GlutaDose Products in Defendants' inventory has been sold to consumers after the expiration date of those products. *Id.* Moreover, Plaintiff point out Defendants' representations about GlutaDose Products, namely that they are effective against COVID-19, and such a representation is not in conformity with Nutradose's quality control standards. *Id.*

In making the foregoing argument, Plaintiffs invoke the "quality control" doctrine, under which an act of interfering with a trademark holder's legitimate quality control measures constitutes trademark infringement because such interference unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark. *Bel Canto*, 837 F. Supp. 2d 208, 230 (S.D.N.Y. 2011) (citing *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243-44 (2d Cir. 2009)). The Eleventh Circuit discussed the quality control doctrine in *Davidoff*. There, the owner of a trademark for a brand of fragrance water sued an unauthorized distributor for trademark infringement. *Davidoff*, 263 F.3d at 1299-1300. The court explained that the district court, in finding that the defendant was liable for trademark infringement, based that determination in part

on the fact that the defendant's act of removing batch codes from glass containers of the plaintiff's fragrance water interfered with the plaintiff's quality control system. *Id.* at 1300 n.4. *Davidoff* noted that "the lack of quality control can rise to the level of a material difference from the trademark owner's product and create a likelihood of confusion." *Id.*[11]

Defendants respond that they do not sell GlutaDose Products after the expiration date of the particular batch. ECF No. [73] at 12. Plaintiff replies that Nutradose's quality control procedures extend beyond ensuring that batches of the GlutaDose Products are not sold after their expiration date. In particular, Plaintiff points out that Nutradose tracks the lots of GlutaDose Products that customers purchase in order to be able to communicate to customers in the event of a recall, and that Bio Dose admits that it does not track their sales of GlutaDose Products after those sales. ECF No. [84] at 9.

As *Davidoff* observed, the quality control doctrine arises in cases where the defendant physically removes markings from a trademarked product that the trademark owner employ to assure quality control. For example, the defendants in *Olaplex, LLC v. MV Beauty Corp.* removed product codes that the plaintiff used as a "quality assurance, anti-counterfeiting, and anti-theft measure" by using chemicals from plaintiff's genuine trademarked products that did not damage the product packaging. *Olaplex, LLC v. MV Beauty Corp.*, No. 17-21293-CIV, 2017 WL 5665367, at *1 (S.D. Fla. Oct. 23, 2017). The court in *Olaplex* found that the removal of the product codes invalidated defendants' exhaustion defense, even though the removal did not damage the packaging. *Id.* at *3. Similarly, in *Bell Canto*, the defendant altered the serial numbers that plaintiff placed on the back of its trademarked products. *Bell Canto*, 837 F. Supp. 2d at 231. The court

---

[11] However, the court did not affirm that finding, affirming the district court instead on its finding that the physical differences in the plaintiff's fragrance water bottles caused by the removal of the batch codes was a material difference in the fragrance water bottles. *Id.*

explained that accurate serial numbers were paramount to the plaintiff's quality control because those numbers corresponded to identifiable batches of the plaintiff's components, audio amplifiers. *Id.* at 229. The serial numbers allowed the plaintiff to quickly identify the products it sold that required servicing or a recall if any of the components in batches of those amplifiers were found to be defective. The court found that the defendant's alteration of serial numbers made it impossible to service or recall defective amplifiers and held that the exhaustion defense did not apply. *Bell Canto*, 837 F. Supp. 2d at 231.

Here, Nutradose asserts it implements a quality control program. In particular, Nutradose assures quality of its GlutaDose Products by distributing those products only to authorized distributors and ensures that no GlutaDose Products are sold after the batch expiration date. ECF No. [61-2] ¶ 37. Nutradose also tracks GlutaDose Products by lot number in order to effectuate a recall if necessary and purports to assure quality control by strictly limiting who may resell its GlutaDose Products. In effect, Nutradose is arguing that Bio Dose interferes with its quality control program by engaging in the unauthorized resale of its GlutaDose Products. However, that is not the sort of "quality control" that the "quality control" doctrine ratifies; that doctrine relates to the removal by a defendant of quality control markings from otherwise genuine trademarked products, making it impossible to effectuate a recall or initiate repairs. Had Bio Dose removed such markings from GlutaDose Products, it would not be possible to effectuate a recall of those products, and the exhaustion defense would not be available as a matter of law. But here there is no evidence either that Bio Dose altered GlutaDose Product packaging by stamping false expiration dates or that Bio Dose removed quality control markings. Instead, Nutradose complains that its GlutaDose Products are being resold without its authorization, and that such unauthorized resale creates a risk that resellers downstream from Defendants can adulterate Nutradose products. Plaintiff's interpretation

of the "quality control" doctrine would nullify the exhaustion defense by making unauthorized resale of genuine trademarked goods a failure to adhere to the trademark owner's quality control standards. The Court declines to adopt such an interpretation.

### ii.   *GlutActive Inserts*

Plaintiff argues Defendants "have promoted their competing product on the back of their sale of GlutaDose Products," which creates consumer confusion and invalidates the exhaustion defense. ECF No. [60] at 31. Specifically, Plaintiffs point to how Defendants inserted promotional marketing materials and samples of GlutActive into shipping boxes for customers who purchased GlutaDose Products from Bio Dose. Pl.'s SMF ¶ 50. That activity, in Plaintiff's view, goes beyond the mere stocking and reselling of GlutaDose Products, an activity which the first sale doctrine protects. In support, they rely on *Hidalgo Corp. v. J. Kugel Designs, Inc.*, 509 F. Supp. 2d 1247 (S.D. Fla. 2007), which found that Defendants engaged in "something more" than merely stocking and reselling a plaintiff's trademarked goods by advertising those goods. *Hidalgo Corp. v. J. Kugel Designs, Inc.*, 509 F. Supp. 2d 1247, 1261 (S.D. Fla. 2007).

In *Hidalgo*, the court determined that the defendants used both the plaintiff's promotional materials and plastic signs showing the name of the plaintiff's product with a font style that was identical to the one plaintiff normally used in order to advertise both plaintiff's products—diamond bands—and defendants' cheaper diamond bands. *Hidalgo*, 509 F. Supp. 2d at 1260. In so finding, *Hidalgo* relied on other cases where defendants used plaintiffs' trademarks to promote either defendants' business or defendants' competing products. *See id.* at 1260 (citing *D 56, Inc. v. Berry's Inc.*, 955 F. Supp. 908, 919-920 (N.D. Ill. 1997) (defendant's use of plaintiff's trademark and promotional materials in advertising and displays, distribution of plaintiff's trademarked pamphlets and posters as promotional tools, and display of signs bearing plaintiff's trademark in

defendants' store precluded defendants' reliance on the exhaustion doctrine)); *Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 916 (Fed. Cir. 1984) (no protection where seller used producer's trademark in a telephone directory advertisement in a way to suggest reseller was a franchisee of the producer); *Stormor v. Johnson*, 587 F. Supp. 275, 280 (D. Mich. 1984) (reseller lost protections of first-sale doctrine where it displayed producer's trademark in reseller's booth at trade show and in advertisement, and stamped reseller's name on producer's promotional literature and used it in advertising)).

Plaintiff flips the reasoning in *Hidalgo* on its head. Had Defendants used *Plaintiff's* trademarks or promotional materials displaying those trademarks to advertise *Defendant's* business or competing products, the exhaustion defense would not be available. In other words, Defendants could not avail themselves of the first sale doctrine if they had inserted promotional marking materials of GlutaDose in shipments of GlutActive to promote GlutActive. If they had done so, consumers might be confused into believing GlutActive Products were actually GlutaDose Products. Instead, Bio Dose was inserting GlutActive promotional materials and samples of GlutActive in boxes of GlutaDose to promote GlutActive. *Hildalgo* does not preclude the exhaustion defense on those facts.

### iii.    Defendants' Websites

Plaintiff also argues Defendants' websites cause consumer confusion by strongly implying that Nutradose and Bio Dose are affiliated, invalidating the exhaustion defense. Specifically, Plaintiff asserts that the website glutactive.com contains biographical information on Santamarta that identifies Santamarta as the creator of GlutaDose and "is riddled with countless references to GlutaDose Products, including unsupported claims about the efficacy of the product." ECF No. [60] at 31-34. The website glutactive.com also uses Nutradose's design trademark and renderings

of GlutaDose Products. *Id.* at 32 (citing Pl's. SMF ¶ 35). Defendant's website similarly makes use of Nutradose's design trademark and has images of GlutaDose Products. *Id.* Further, the biodose.com website contains two links to social media accounts, one to Nutradose's GlutaDose Facebook page and another to the @glutadose Instagram account, which Plaintiff asserts falsely suggests the companies are affiliated. *Id.* at 33.

Defendants respond that they do not falsely imply an affiliation between Nutradose and Bio Dose on both websites because those websites contain disclaimers which state that GLUTADOSE is a registered trademark of Nutradose and that Bio Dose is not affiliated with Nutradose. ECF No. [73] at 13. Defendants further respond that the nominative fair use doctrine protects Defendants' sales of GlutaDose Products because the websites truthfully identify those products as genuine GlutaDose Products. *Id.* (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924); *Techs., Inc. v. Ecosense Int'l, Inc.*, 802 F. Supp. 2d 1273, 1282 (M.D. Fla. 2012)).[12] In addition, Defendants reason that Plaintiff's arguments regarding false affiliation are misplaced because evidence that they misrepresented themselves as an authorized agent of Plaintiff cannot, as a matter of law, support a trademark infringement claim. *Id.* at 14 (citing *Brain Pharma*, 858 F. Supp. 2d at 1254). Addressing the biographical information on Santamarta on the glutactive.com website, Defendants assert that that information relates only to his development of GlutaDose and at most raises a possibility of confusion that cannot support a trademark infringement claim. *Id.*

Plaintiff replies that Defendants' use of images of Nutradose's trademark and products on biodosepharma.com go beyond "mere stock and resale" because that use greatly exceeds the extent to which the website in *Brain Pharma* made use of the trademark at issue. Therefore, Defendants are liable for trademark infringement under the reasoning of that case. ECF No. [84] at 6. Plaintiff

---

[12] As stated, Defendants did not make their showing on the nominative fair use doctrine in Defendants' Motion. They do not do so in response to Plaintiff's Motion either.

also replies that Defendants ignore how the exhaustion defense is unavailable where a website makes a false association between a trademark owner and a reseller. *Id.* at 10.

Some courts outside the Eleventh Circuit have explained that a reseller may use a mark to advertise truthfully that the reseller sells certain branded products *so long as* the advertisement does not suggest an affiliation or endorsement by the mark holder. *See, e.g.*, *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 484, 72 U.S.P.Q.2d 1011 (5th Cir. 2004). As the Eleventh Circuit has explained, "it is well established that falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement." *See Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) (citation and internal quotation marks omitted). Accordingly, some courts have also held that the first sale doctrine does not protect resellers who "give the impression that they are favored or authorized dealers for a product when in fact they are not." *See, e.g.*, *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1241 (10th Cir. 2006) (citation omitted); *see also Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 643 (N.D. Tex. 2009) (former dealer's website found to be infringing because it falsely suggested a continuing relationship with the supplier); *David Yurman Enterprises, LLC v. Sam's East, Inc.*, 114 U.S.P.Q.2d 1723, 2015 WL 1602136 (S.D. Tex. 2015) (Trademark owner sufficiently pleaded that defendant's website's use of its mark in advertising DAVID YURMAN jewelry falsely implied that defendant was an authorized retailer). In determining whether a reseller "give[s] the impression" that it is a favored or authorized dealer on its website, the Tenth Circuit has looked to whether the reseller's use of the trademark owner's mark indicates "an intent to cause consumer confusion." *See Australian Gold*, 436 F.3d at 1228, 1241 (10th Cir. 2006) ("Defendants' intentional use of Plaintiffs' trademarks on Defendants' Web sites, in the metatags for the Web sites, and with Overture.com constitutes more than merely displaying and stocking trademarked

items."). If a website does not create an impression that the reseller is affiliated with the trademark owner, the exhaustion defense may be available to the reseller. *See Standard Process*, 554 F. Supp. 2d at 869.

Viewing the facts in the light most favorable to Defendants and accepting all reasonable inferences from those facts, there is a factual dispute as to whether Defendants intended to create the impression that Bio Dose is affiliated with Nutradose. To be sure, the website biodosepharma.com contains large images of GlutaDose Products and detailed descriptions of those products, and only those products. *See* ECF No. [61-10]. In addition, the biodosepharma.com webpage contained links to Nutradose's Facebook account and to the Instagram handle @glutadose. These features of the website, without more, support the inference that Bio Dose was holding itself out as an authorized reseller of Nutradose. However, the same webpage contains the following header at the bottom of the webpage: SALES POINTS & TRADEMARK DISCLAIMER. ECF No. [61-10] at 2. Below that header is the following statement: "GLUTADOSE is a registered trademark of NUTRADOSE LABS LLC. BIO DOSE PHARMA, LLC, the maker of the present advertising, is in [sic] not affiliated with NUTRADOSE LABS LLC." *Id.* Those facts are counter-indications of an intent to give the impression that Bio Dose is an authorized retailer.

Those facts make this a closer case than the one in *Standard Process*. There, the court concluded as a matter of law that the defendant's website did not create the impression that he was an authorized dealer of the trademark owner. *Standard Process*, 554 F. Supp. 2d at 869. The defendant's website "[did] not include any pictures of SP Products, and most importantly, it prominently displays a disclaimer in the first paragraph of the page where a customer may buy SP Products. The disclaimer explicitly states that [www.spinelife.com] is not an 'authorized seller' of

[Standard Process's products] and is not 'affiliated with' Standard Process." *Id.* By contrast, the website here yields conflicting indications of Defendants' intent to create the impression it is an authorized retailer. Under the circumstances here, *Standard Process* suggests that a question of fact exists as to whether Defendants' disclaimer at the bottom of www.biodosepharma.com neutralizes any suggestion of affiliation by the website's prodigious use of images of GlutaDose Products and the GLUTADOSE mark, and whether Defendants intended to suggest such an affiliation. *See id.* ("While the effectiveness of a disclaimer may generally be a question of fact, 'a disclaimer expressly declaring that the seller is "not affiliated" with the owner of the trademark or is "not an authorized distributor" of the trademark owner's products has been held to be an effective means of preventing confusion in the minds of consumers as to affiliation with the owner of the trademark.'").

The next question is whether the *About Raimundo Santamaria* page in the glutactive.com domain gives the impression that Defendants are affiliated with Nutradose. The *About Raimundo Santamarta* page identifies Santamarta as the creator of GlutaDose. Pl.'s SMF ¶ 35; Defs.' CSMF ¶ 35. Thus, the issue is whether that identification, without more, supports the inference that Santamarta, as the inventor of GlutaDose, was presently selling GlutaDose on glutactive.com. It does not. This is because no evidence shows Defendants purported to sell GlutaDose on glutactive.com. That being the case, the *About Raimundo Santamarta* page, to the extent it can be considered an advertisement for GlutaDose Products, does not create the impression that BioDose was an authorized GlutaDose Products reseller.

Plaintiff's view is that "mere stock and resale" of a trademarked product excludes showing any pictures or images of those products on a reseller's website. *See, e.g.*, ECF No. [74-1] at 19 ("In [*Brain Pharma*], defendant's website listed in text . . . the plaintiff's products that were

available for sale and used the trademark sparingly next to the product description with no pictures or images of the products. . . . In contrast, Defendants' biodosepharma.com website is inundated with images of GlutaDose Products and the GlutaDose design trademark, along with colorful advertising language[.]"). Plaintiff's no-images-or-pictures rule is not supported by the case law that Plaintiff cites. In *Volkswagen Grp. of Am., Inc. v. Varona*, the court found that the nominative fair use doctrine did not protect defendant's sale of counterfeit vehicle wheel rims; that case did not involve the resale of genuine trademarked product. *Volkswagen Grp. of Am., Inc. v. Varona*, No. 19-24838-CIV, 2021 WL 247872, at *10 (S.D. Fla. Jan. 25, 2021).

This is not a case where Plaintiff alleges, or the evidence shows, that Defendants sold counterfeit GlutaDose Products. In *Caterpillar*, the defendant registered six domain names that were comprised of plaintiff Caterpillar's marks: catusedequipment.com; catnewequipment.com; caterpillarusedequip.com;          caterpillarnewequip.com;          caterpillarequipment.com; caterpillardealers.com (collectively, the "disputed domain names"). *Caterpillar Inc. v. Telescan Techs., L.L.C.*, No. CIV.A. 00-1111, 2002 WL 1301304, at *3 (C.D. Ill. Feb. 13, 2002). In four of those domains, the welcome pages "purported to be 'A Listing Service for Caterpillar Equipment.'" *Id.* at *3. The court in *Caterpillar* found those attributes to be evidence of "active or purposeful deception, false suggestion, or misrepresentation on the part of a reseller, designed or likely to cause confusion about whether or not the reseller is an authorized dealer." *Id.* at *5 (C.D. Ill. Feb. 13, 2002). The facts here do not support active or purposeful deception on Defendant's part, and there is a factual dispute as to whether the biodosepharma.com website contains a false suggestion or misrepresentation that Bio Dose is an authorized reseller of Nutradose. As such, *Caterpillar* does not support Plaintiff's argument on the facts here.[13] Similarly, the court in *Lennar*

---

[13] In addition, the facts of *Caterpillar* do not support a finding that the link in biodosepharma.com to the GlutaDose Facebook Page and the @glutadose Instagram account "is enough to invalidate the

*Pacific* found active or purposeful deception where a defendant adopted domain names based on the plaintiff's trademark to "divert traffic away from [p]laintiff's [] website." *Lennar Pac. Properties Mgmt., Inc. v. Morgan*, No. 07-14119-CIV, 2007 WL 9702467, at *10 (S.D. Fla. July 20, 2007).

Accordingly, summary judgment is not warranted on Defendants' exhaustion defense.

### b. *First and Fourth Affirmative Defenses*

Defendants assert as affirmative defenses that Plaintiff fails to state a claim on which relief may be granted and there are no damages. Plaintiff argues neither of those defenses are actual affirmative defenses and thus seeks summary judgment on those defenses. ECF No. [60] at 26. Plaintiff also argues it has cognizable claims and has suffered damages. *Id.* Defendants do not respond to these arguments.

Failure to state a claim is not an affirmative defense, and this case survived the motion-to-dismiss stage. *See Affiliati Network, Inc. v. Wanamaker*, No. 18-22576-CIV, 2019 WL 7376766, at *8 (S.D. Fla. Nov. 25, 2019), *aff'd* 847 F. App'x 583 (11th Cir. 2021) (granting summary judgment on failure to state a claim defense). Neither is the "no damages" defense. *See Morrison v. Executive Aircraft Refinishing Inc.*, 434 F. Supp. 2d 1314, 1318 (S.D. Fla. 2005) ("[A] defense which simply points out a defect or lack of evidence in a plaintiff's case is not an affirmative defense."). Thus, the Court grants summary judgment in favor of Plaintiff on Defendants' First and Fourth Affirmative Defenses.

---

exhaustion defense." *See* ECF No. [60] at 33. Had Defendants established a domain name that included the GlutaDose mark that redirected consumers to Bio Dose websites or social media pages, *Caterpillar* would be on point. Such is not the case here.

### c. Non-Distinctiveness

Plaintiff argues Defendants' non-distinctiveness defense fails as a matter of law on several grounds, including that the GlutaDose mark is distinctive because "it is either arbitrary or suggestive, both of which are 'inherently distinctive as a matter of law.'" ECF No. [60] at 27 (citing *Edge Systems LLC v. Aguila*, 186 F. Supp. 3d 1330, 1346 (S.D. Fla. 2016)). Defendants do not respond to Plaintiff's arguments. Generally, "[w]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such an argument or claim abandoned." *Jones v. Bank of Am., N.A.*, 564 Fed. App'x 432, 434 (11th Cir. 2014). Given that the USPTO registered the GlutaDose mark, there is undisputed evidence that the GlutaDose mark is "inherently distinctive." *Edge Sys. LLC v. Aguila*, 186 F. Supp. 3d 1330, 1346 (S.D. Fla. 2016), *aff'd*, 708 F. App'x 998 (Fed. Cir. 2017). Thus, the Court finds the GlutaDose mark is inherently distinctive and grants summary judgment on Defendant's non-distinctiveness defense.

### d. Laches

Plaintiff argues the defense of laches is unavailable to Defendants as a matter of law. ECF No. [60] at 27. The Court has rejected Defendant's argument in its Motion with respect to its laches defense. For the reasons previously stated, the laches defense is unavailable to Defendants as a matter of law, so summary judgment is granted in favor of Plaintiff on Defendants' laches defense.

### e. Licensing Defense

Plaintiff argues that Defendants' license defense fails as a matter of law because the Trademark Licensing Agreement was terminated on January 29, 2021 and was never replaced. ECF No. [60] at 28 (citing Pl.'s SMF ¶ 21). Defendants do not respond to that argument. As the Court discussed in Defendants' Motion, the Court finds that the Trademark Licensing Agreement was terminated by the Court Ordered Sale; however, circumstantial evidence that Unipharma and New Vision continued to sell GlutaDose Products to Bio Dose supports the existence of a

subsequent licensing agreement. Accordingly, the existence of a license is a fact question, so summary judgment is denied in favor of Plaintiff on Defendants' license defense.

### 2.  Counts I – III

Because the Court finds there are genuine disputes of material fact concerning Defendants' exhaustion defense, the Court declines to consider Plaintiff's remaining arguments on those Counts. Summary judgment is denied as to Counts I, II and III.

### 3.  Count IV

Plaintiff contends Defendants are liable as a matter of law on Count IV for conversion of Nutradose's Amazon Brand Registry and the GlutaDose Instagram Accounts because Defendants maintained control of the Amazon Brand Registry and the accounts after the Court Ordered Sale transferred that property to New Vision who in turn sold that property to Nutradose on December 17, 2021. ECF No. [60] at 23.

Defendants respond that Defendants abandoned the GlutaDose Instagram accounts in mid-2021, before Plaintiff acquired those accounts from New Vision. ECF No. [73] at 17. Defendants contend that the Amazon Brand Registry was "passively in" Bio Dose's name by authority of Unipharma, so Defendants did not exercise any overt act of adverse dominion. *Id.* at 17-18.

Plaintiff replies that the evidence supporting that Defendants abandoned the Instagram Accounts in mid-2021, the Santamarta Declaration, is a sham. Plaintiff asserts that it contradicts his deposition testimony, which suggests Defendants did not abandon the accounts until March 2022, after Nutradose acquired the accounts from New Vision. ECF No. [84] at 12. Moreover, Plaintiff asserts that Defendants had an affirmative duty to turn over the Amazon Brand registry on account of the Court Ordered Sale. *Id.* at 13.

To establish conversion under Florida law, a plaintiff must show a "positive, overt act or acts of dominion or authority over the . . . property inconsistent with and adverse to the rights of

Case No. 22-cv-20780-BLOOM/Otazo-Reyes

the true owner." *Columbia Bank v. Turbeville*, 143 So. 3d 964, 969 (Fla. 1st DCA 2014) (quoting *S.S. Jacobs Co. v. Weyrick*, 164 So. 2d 246, 250 (Fla. 1st DCA 1964)).

The first question is thus whether the evidence shows there have been any positive, overt acts of dominion or authority either over the Amazon Brand Registry or the Instagram accounts. Plaintiff points to the Action Plan Email to show that Defendants had control over the Instagram accounts. Pl.'s SMF ¶ 44; *see also* ECF No. [61-11]. However, the Action Plan Email describes no particular act in exercise of Defendants' control over the Instagram accounts and only supports that Defendants had the capacity to exercise control over those accounts. Nevertheless, the record shows that Defendants committed overt acts on the Instagram accounts. The Gonzalez Declaration states that Defendants closed the @glutadose.es account, deleting the content in that account and losing 5,181 Instagram followers. ECF No. [61-2] ¶ 40. The Gonzalez Declaration also states that Defendants renamed the @glutadose account @glutaactivevevzla and deleted the posted GlutaDose content. *Id.* These are positive, overt acts. However, Plaintiff has not shown that Defendants committed positive, overt acts of dominion or authority over the Amazon Brand Registry. The Gonzalez Declaration states, "Defendants improperly maintained control of the GlutaDose Amazon Brand Registry until Nutradose successfully used Amazon's internal procedure to transfer the Amazon Brand Registry to itself on or about March 2022." *Id.* ¶ 39. The Gonzalez Declaration does not elaborate on how Defendants "maintained control" over the Amazon brand registry for GlutaDose. The Gonzalez Declaration explains that Nutradose transferred the Amazon Brand Registry to itself using Amazon's internal procedures and suggests that Amazon, not Bio Dose, "maintained control" over the brand registry. In the light most

favorable to Defendants, the Gonzalez Declaration raises a fact dispute on whether Defendants engaged in any act or dominion or authority over the brand registry.[14]

Thus, the issue is whether Plaintiffs had rights to the Instagram accounts as the true owners at the time of the overt acts.[15] The parties dispute when Santamarta abandoned the Instagram Accounts but do not brief when the Instagram accounts were deleted or otherwise modified. As such, Plaintiff has not met its burden to show that Plaintiff was the owner of the accounts at the time of the overt acts. Nor has Plaintiff demonstrated as a matter of law that Defendants committed conversion of the Instagram accounts or the Amazon Brand Registry. Summary judgment is denied on Count IV.

### 4.   Count V

Plaintiffs argue that Defendants are liable under FDUTPA because they are liable for federal trademark infringement due to their various acts, including continuing to use the GlutaDose mark without authorization and by inserting promotional materials for GlutActive in shipments of GlutaDose. ECF No. [60] at 24-25. However, the Court has determined there are questions of fact concerning whether the exhaustion defense protects Defendants' sales of GlutaDose Products. Accordingly, summary judgment is not warranted on Plaintiff's FDUTPA claim on that basis.

In addition, Plaintiff argues that it was a deceptive act for Bio Dose to purchase GlutaDose Products through Alchemy Valley. ECF No. [60] at 25. *See KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1073 (Fla. 5th DCA 2008) ("Although not specifically identified in the statute, there are

---

[14] In its Reply, Plaintiff argues Defendants had an affirmative duty to transfer the Amazon brand registry to New Vision under the Court Ordered Sale. ECF No. [84] at 13.  However, Plaintiff does not locate that duty either in the bankruptcy court's order or in the Asset Purchase Agreement. Nor does Plaintiff identify legal authority supporting that Defendants had an affirmative duty, the failure to act in accordance with would constitute a positive, overt act of dominion or authority over the brand registry.

[15] The parties do not dispute that the Instagram accounts are property for the purposes of a conversion claim.

basically three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: 1) a deceptive act or unfair practice; 2) causation; and 3) actual damages."); *see also State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1326 (S.D. Fla. 2017) ("A deceptive act occurs when a defendant makes 'a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'"). The parties dispute whether Alchemy Valley was a "straw man" purchase of GlutaDose Products. SMF ¶ 29; CSMF ¶ 29. As such, there is a dispute of fact on whether Bio Dose's purchase of GlutaDose Products from Alchemy Valley was a deceptive act.

### 5. Nutradose's Requested Relief

Plaintiff seeks a permanent injunction, Defendants' profits and actual damages, and attorney fees. Because the Court finds that there are genuine disputes of material fact on all Counts, Plaintiff is not entitled to its requested relief at this stage.

### IV.     CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows.

1. Defendants' Motion for Summary Judgment, **ECF Nos. [62]**, is **DENIED**.

2. Plaintiff's Motion, **ECF No. [60]**, is **GRANTED IN PART AND DENIED IN PART**.

    a. The Court grants summary judgment in favor of Plaintiff on the following Affirmative Defenses:

        i. Failure to state a claim upon which relief can be granted (First Affirmative Defense);

        ii. Laches (Second Affirmative Defense); and

        iii. No damage (Fourth Affirmative Defense).

    b. The Court denies summary judgment in favor of Plaintiff on all Counts.

Case No. 22-cv-20780-BLOOM/Otazo-Reyes

   c.  Plaintiff's request for a permanent injunction, actual damages, Defendants'

       profits, and for attorney fees is denied.

    **DONE AND ORDERED** in Chambers at Miami, Florida, on May 25, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record