# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 22-cv-20780-BLOOM

NUTRADOSE LABS, LLC,

      Plaintiff,

v.

BIO DOSE PHARMA, LLC, *et al.*,

      Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court upon the conclusion of a seven-day bench trial. Following the presentation of testimony and other evidence, the Court permitted the parties to file written closing arguments and proposed findings of fact and conclusions of law. Plaintiff Nutradose Labs, LLC ("Nutradose") filed its Closing Argument and Proposed Findings of Fact and Proposed Conclusions of Law. ECF No. [156]. Defendants Bio Dose Pharma, LLC ("Bio Dose") and Raimundo Santamarta ("Santamarta," and together, "Defendants") filed their Closing Argument and Proposed Findings of Fact and Proposed Conclusions of Law. ECF No. [157]. Nutradose then filed a Reply Closing Argument. ECF No. [158]. The parties have also filed their Joint Exhibits, ECF No. [144]; Defendants filed their admitted exhibits, ECF No. [145]; and Nutradose filed its admitted exhibits, ECF No. [155]. The Court has carefully reviewed the parties' submissions, the trial transcripts, ECF Nos. [148] – [154], the record in this case, the applicable law, and is otherwise fully advised.

I.   Introduction.................................................................................................................. 3
II.  Findings of Fact ........................................................................................................... 4
   A.  Unipharma, LLC ................................................................................................... 4
   B.  Bio Dose.................................................................................................................. 4

C.   March 30, 2022 Email Thread ................................................................. 5

D.   GlutaDose Mark ..................................................................................... 6

E.   Website ................................................................................................... 6

F.   Social Media Accounts .......................................................................... 8

i.   Instagram Accounts Creation ........................................................ 8

ii.   Disposition of the Instagram Accounts ....................................... 9

iii.   Ownership of the Instagram Accounts ....................................... 10

G.   Foreign Trademark Registrations ........................................................ 11

H.   Trademark License Agreement ............................................................ 11

I.   Bankruptcy Court Order ...................................................................... 12

J.   Asset Purchase Agreement .................................................................. 13

K.   Bio Dose Purchased GlutaDose Products from Alchemy Valley ........ 16

L.   Bio Dose Also Purchased GlutaDose Products from Unipharma ......... 17

M.   GlutActive Mark .................................................................................. 18

N.   Cybersquatting Lawsuit ....................................................................... 18

O.   Manufacturing and Supply Agreement ................................................ 19

P.   Customer Complaints ........................................................................... 19

Q.   GlutActive Inserts ................................................................................ 20

R.   Bio Dose's Profits ............................................................................... 21

S.   Nutradose's Costs ................................................................................ 23

T.   Goodwill ............................................................................................... 23

III.   Conclusions of Law .................................................................................. 24

A.   Jurisdiction and Venue ........................................................................ 24

B.   Counts I, II, and III (Trademark Infringement) .................................. 24

i.   Valid Protectable Mark ............................................................... 26

ii.   Likelihood of Confusion ............................................................. 27

a.   Type of Mark ....................................................................... 28

b.   Similarity of the Marks ....................................................... 29

c.   Similarity of the Products the Mark Represents ................. 30

d.   Similarity of the Parties' Retail Outlets and Customers ..... 30

e.   Similarity of Advertising Media Used ................................ 30

f.   Defendant's Intent ............................................................... 31

g.   Actual Confusion ................................................................. 32

iii.   Santamarta's Liability for Trademark Infringement ................. 33

iv.   Defendants' Affirmative Defenses ............................................. 34

|     |     | a.   | License Agreement | 34 |
|     |     | b.   | Exhaustion/First Sale Doctrine | 38 |
|     | C.  | Count IV (Conversion) | | 40 |
|     | D.  | Count V (FDUTPA) | | 41 |
|     | E.  | Relief | | 42 |
|     |     | i.   | Permanent Injunction | 42 |
|     |     | ii.  | Disgorgement of Profits | 43 |
|     |     | iii. | Actual Damages | 44 |
|     |     | iv.  | Attorney Fees and Costs | 46 |
| IV. | CONCLUSION | | | 47 |
|     | Appendix | | | 49 |

## I.    INTRODUCTION

This action arises from Defendants' alleged infringement of Nutradose's trademark ("GlutaDose Mark"). *See generally* ECF No. [1]. Nutradose asserts the following claims: (1) Federal Trademark Infringement (15 U.S.C. § 1141(a)) (Count I) and Common Law Trademark Infringement (Count III); (2) False Designation of Origin (15 U.S.C. § 1125(a)) (Count II); (3) Conversion (Count IV); and (4) Unfair and Deceptive Trade Practices (FDUTPA) (Fla. Stat. § 501.204) (Count V). *Id.* ¶¶ 36-73.

Defendants asserted the following affirmative defenses: (1) Failure to state a claim upon which relief can be granted (First Affirmative Defense) and no damage (Fourth Affirmative Defense); (2) Laches (Second Affirmative Defense); (3) License (Third Affirmative Defense); (4) the GlutaDose Mark "was not distinctive at the time of registration of the domain name" (Fifth Affirmative Defense); and (5) Exhaustion/the First Sale Doctrine (Sixth Affirmative Defense).

Nutradose seeks a permanent injunction, actual damages, Defendants' profits, and attorney fees. On May 25, 2023, the Court entered an Omnibus Order on Defendants' Motion for Summary Judgment and Plaintiff's Partial Motion for Summary Judgment, ECF No. [66], denying Defendants' Motion for Summary Judgment and granting in part and denying in part Nutradose's

Partial Motion for Summary Judgment, ECF No. [60]. ECF No. [98] ("Omnibus Order"). The Court granted summary judgment in favor of Nutradose on Defendants' First, Second, Fourth, and Fifth Affirmative Defenses; and denied summary judgment on Defendants' Third and Sixth Affirmative Defenses. *Id.*

This action proceeded to a seven-day bench trial. ECF Nos. [135] – [138], [141] – [143]. Based on the Court's careful review of the evidence, the parties' arguments, and the applicable law, the Court enters its findings of fact and conclusions of law.

## II.     FINDINGS OF FACT

The Court sets forth below its findings of facts by topic and generally in the order in which the facts occurred.

### A.  Unipharma, LLC

On November 29, 2012, Santamarta created Unipharma, LLC ("Unipharma"), a business which owned, managed, and operated a blow fill-seal manufacturing facility that packaged prescription pharmaceuticals, over-the-counter pharmaceuticals, and "nutraceutical" oral and ophthalmic solutions. Day 4 Trial Tr. at 7:8-9,[1] ECF No. [151]; Joint Pre-trial Stipulation (PTS) at 15, ECF No. [103]. Among other products, Unipharma sold GlutaDose Products, which contain glutathione, an antioxidant. *See* Day 7 Trial Tr. at 26:23-28:4, 28:11-24, 39:8-14, ECF No. [154]. Santamarta was its president, Chief Executive Officer (CEO), and controlling and majority equity owner. Day 4 Trial Tr. at 7:10-15.

### B.  Bio Dose

Santamarta created Bio Dose on January 23, 2014, and was and continues to be its president, CEO, and manager. Day 4 Trial Tr. at 7:16-24. Santamarta established Bio Dose to

---

[1] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

transact business with customer accounts that were smaller than those belonging to Unipharma, including accounts with certain retailers, distributors, and online businesses. Day 7 Trial Tr. 25:18-25, ECF No. [154]. Santamarta is deeply involved with Bio Dose's day-to-day operations; he testified that he supports doing "anything" for Bio Dose, including helping to dry the rugs when they get wet, and "nothing happens in [Bio Dose] behind [his] back." Day 6 Trial Tr. at 28:4-15.

Bio Dose employs German Perez (Perez), who serves as its manager, accountant, and administrative director. Perez is responsible for all accounts and Bio Dose's accounting records, controls product inventory, payments, and oversees its day-to-day operations. Day 4 Trial Tr. at 7:16-24; Day 7 Trial Tr. at 22:22-23:11, 128:5-8. He reports to Santamarta, whom he testified is the ultimate decisionmaker at Bio Dose. Day 7 Trial Tr. at 101:22-102:1. Bio Dose's other employees include Elena Dolinski, its Chief Operating Officer (COO), Ronaldo Alvarez, Yohana Santamarta, and until recently a certain "Mr. Catequi". Day 6 Trial Tr. at 23:10-17, ECF No. [153]; Day 7 Trial Tr. at 97:20-98:4.

Bio Dose advertises primarily on the internet through their website and through third-party platforms, including Amazon. Joint Ex. (JX) 13, ECF No. [144-13]; Pl.'s Ex. (PX) 11, ECF No. [155-2]; PX 13, ECF No. [155-4]; PX 31, ECF No. [155-12]; PX 32, ECF No. [155-13]; PX 33, ECF No. [155-14].

### C. March 30, 2022 Email Thread

Pertinent to the facts and evidence that follow are the details of an email thread between Santamarta and Rick Ruz, one of Santamarta's counsel. On March 24, 2022, nine days after Nutradose filed the present suit, ECF No. [1], Santamarta sent an email to Ruz. PX 49 (March 30, 2022 Email Thread) at 2, ECF No. [155-23]. Santamarta therein asks, "[c]an we continue to use on the website the images that have been there for 3 years and refer to Glutadose[?]" *Id.* Next, the email states: "[w]e may include information material within the submissions, in which we will not

continue with the GlutaDose and migrate to the Glutactive." *Id.* Santamarta continues, "[c]an we clean up glutadose accounts and Glutadose.es images that refer to Glutadose and change the accounts to GlutActive?" *Id.* Santamarta further states, "[b]y leaving the accounts for GlutActive and erasing the Glutadose information, we can create momentary accounts to preserve the primary Glutadose and Glutadose.es accounts, preventing them from being taken by someone else?" *Id.* On March 29, 2022, Ruz recommended that Santamarta add the following "Trademark Disclaimer" to the GlutaDose Website: "GLUTADOSE is a registered trademark of NUTRADOSE LABS LLC. BIO DOSE PHARMA, LLC, the maker of the present advertising, is in [*sic*] not affiliated with NUTRADOSE LABS LLC." *Id.* at 1.

### D. GlutaDose Mark

On November 12, 2018, Unipharma filed with the United States Patent and Trademark Office Application Serial Number 88/189,823 for the GlutaDose Mark in connection with "[d]ietary supplements with antioxidant and cell protection properties which also support[] the immune system." Joint Ex. (JX) 1, ECF No. [144-1]. On December 24, 2019, the GlutaDose Mark was registered, obtaining U.S. Registration No. 5,945,760. *Id.* Nutradose is the last listed owner of the trademark, which is identified as a "LIVE" trademark. *Id.*

### E. Website

Bio Dose operated a website at the domain, www.glutadose.com, which was created *circa* March 2019. *See* Day 6 Trial Tr. at 15:8-16:2, ECF No. [153]; *see also* PX 49. Alejandro Gonzalez, the Chief Financial Officer and COO of Nutradose (Gonzalez), testified that Unipharma commissioned Creative Hub, a boutique advertising agency created in 2008, to develop a website at www.biodosepharma.com. *See* Day 1 Trial Tr. at 49:5-12; 163:3-7, ECF No. [148]. The website was created for Unipharma to be used by Bio Dose as their exclusive online seller. *Id.* at 54:2-7.

Plaintiff represents that the website at www.biodosepharma.com was admitted as Plaintiff's Exhibit 11, ECF No. [155-2], which is a video that was played at trial. *See* ECF No. [156] at 41. The website at domain www.glutadose.com and the one at domain www.biodosepharma.com appear to be identical. *Compare* JX 13 *with* PX 11. As such, the Court finds the websites at the two domains are the same. The Court herein refers to the website as the "Website."

A screenshot of the Website as it appeared on December 21, 2022 at 10:36 a.m. is filed on the record. JX 13; *see also* ECF No. [157] at 89 n.25. The screenshot of the Website landing page is appended to the bottom of this Order. At the top left of the Website is a logo for "BioDose Pharma." JX 13. The Website advertises only GlutaDose Products, which are displayed prominently throughout the main webpage. *Id.* As such, the Website necessarily displays the GlutaDose Mark. Immediately beneath three types of GlutaDose Products displayed on the Website are graphic buttons which contain either the words "BUY NOW" or "Learn more". *Id.* Creative Hub developed those renderings, including the buttons, each of which links to additional information on each of the products and to videos providing further explanation on each of the GlutaDose Products. *See id.* at 49:5-12; 163:3-7. The website contains the following disclaimer at the bottom of the webpage:

> GLUTADOSE is a registered trademark of NUTRADOSE LABS LLC.
> BIO DOSE PHARMA, LLC, the maker of the present advertising, is in [*sic*] not affiliated with NUTRADOSE LABS LLC.

JX 13 at 1.

Given that the disclaimer is identical to the one suggested in the March 20, 2023 Email Thread, the disclaimer was added after this action was filed on the advice of counsel. *See* Day 1 Trial Tr. at 15:8-20. At the footer of the Website, there are handles for the social media sites Facebook and Instagram, which contained links that in December 2022 directed website visitors

who clicked on the links to Nutradose's accounts on those sites. *Id.* at 68:5-69:5; *see also id.* at 65:14-16 ("Q. Okay. And so when was the video created? A. I think it was late December 2022. So about a year after we had acquired the trademark.").

Based on the evidence presented at trial, including the bankruptcy proceeding and the March 30, 2022 Email Thread, the Court finds the Website remained unchanged from March 2019 until March 29, 2022, when the disclaimer was added. The Court also finds the Website does not indicate that Nutradose, versus Bio Dose, originates GlutaDose Products; in other words, the Website does not identify Bio Dose as a reseller of Nutradose products. For that reason, the Website creates the impression that GlutaDose Products originate from Bio Dose.

### F.  Social Media Accounts

#### i.  *Instagram Accounts Creation*

At issue in this case are two social media accounts on the Instagram platform. Gonzalez testified that one of the Instagram accounts, @glutadose, was created in September 2018 and the account "has changed [its] username one time", to @glutactivevzla. *See* Day 2 Trial Tr. at 133:5-18, ECF No. [149]. As set forth below, the GlutActive trademark did not exist in 2018. *Id.* at 133:19-21. The evidence at trial does not indicate when the second Instagram account, @glutadose.es, was created. Gonzalez testified that Creative Hub provided marketing services to Unipharma that included "dress[ing] up" social media accounts, including by branding them, uploading logos, posting on the accounts, and tagging photographs. Trial Day 1 Tr. at 46:15-47:1, 80:2-8. Creative Hub did not create the Instagram GlutaDose accounts but was given access to them to perform the dressing up. Santamarta testified that Bio Dose paid for and managed the social media accounts for GlutaDose's promotion and sale, including @glutadose and @glutadose.es. Day 6 Trial Tr. at 35:6-11. Gonzalez further testified that Unipharma had an account on Facebook, another social media platform. *Id.* at 81:3-7.

Because the testimony is conflicting, the Court finds that @glutadose and @glutadose.es were opened by or on behalf of Unipharma, and that Unipharma, not Bio Dose, paid for the management of the Instagram accounts. The Court makes this finding based on Gonzalez's credible and detailed testimony. By contrast, Santamarta's testimony was conclusory on this factual issue. The Court's conclusion is bolstered by the fact that Gonzalez testified that Unipharma had another social media account with Facebook. That testimony supports the finding that Unipharma was the entity that undertook to create and maintain a social media presence for marketing purposes. That conclusion is further bolstered by Gonzalez's testimony that Creative Hub handed back control to Unipharma over the Instagram Accounts. Day 1 Trial Tr. at 223:24-224:2.

The Court also finds that, at some point, Bio Dose gained control over the Instagram accounts based on Santamarta's testimony, described below, asserting that he gave the order to "abandon" all items related to GlutaDose.

### ii.    *Disposition of the Instagram Accounts*

Nutradose presented evidence of how the two GlutaDose Instagram Accounts appeared on April 14, 2022, shortly after the filing of this lawsuit. PX 24, ECF No. [155-7]; PX 25, ECF No. [155-7]. At the time, @glutadose had 25,700 followers. PX 25. As of November 15, 2022, @glutactivevzla had a similar number of followers, 25,200, suggesting that the accounts are one and the same. PX 32, ECF No. [155-13].

Nutradose also presented evidence of posts from other Instagram accounts that were "tagging" @glutadose and that some of those posts were advertising GlutaDose Products. PX 33, ECF No. [155-14]. A few of the tags were posts from Santamarta himself, wherein he tagged the account in question in January 2020, before the creation of the product GlutActive, which the Court describes below. *See* Day 5 Trial Tr. at 42:5-8, ECF No. [152].

When confronted with his testimony at a deposition on November 17, 2022 regarding the Instagram accounts, Santamarta testified that he then said he "gave the order to abandon everything related to GlutaDose", which includes @glutadose and @glutadose.es, "eight months or more" prior to the deposition, meaning that the "order" occurred in March 2022 or earlier. *Id.* at 73:3-74:23. Santamarta's testimony at trial on August 31, 2023 suggested that, at some point in July of 2020, Santamarta transferred the Instagram accounts to a Venezuelan company that then managed and later abandoned the accounts in October 2020. Day 4 Trial Tr. at 67:12-15; 68:4-25. However, on this issue, Santamarta presented a defensive demeanor when testifying, deflected opposing counsel's questions in part by adverting to his health issues, and gave unclear responses. The Court did not find his testimony credible to that extent and its finding is further bolstered by Santamarta's Declaration, filed in support of Defendants' Motion for Summary Judgment. ECF No. [64-1]. There, Santamarta stated that www.glutadose.com would be allowed to lapse through nonrenewal, that Bio Dose instructed its foreign agency to close the @glutadoseand @glutadose.es accounts, and Bio Dose **continued** to operate social media sites that it had from **before** the bankruptcy. *Id.* ¶¶ 33, 42, 45. Those representations simultaneously support that the accounts were transferred to the foreign agent **on or after** March 2022 and contradict Santamarta's testimony that he ordered that the accounts be abandoned prior to the bankruptcy.

When considered with Santamarta's statements in the March 30, 2022 Email Thread described above, the Court finds that Defendants deleted the @glutadose.es account and changed the name of the @glutadose account to @glutactivevzla after the filing of the instant suit.

### iii.    *Ownership of the Instagram Accounts*

The evidence presented at trial does not establish Unipharma's ownership of the Instagram Accounts. In fact, no evidence or argument was presented that any person can "own" an Instagram Account. Setting that aside, no evidence conclusively established that the access to the Instagram

accounts was transferred as part of the Bankruptcy Sale. Schedule 4.9(d) of the agreement governing the Bankruptcy Sale, the Asset Purchase Agreement (APA), identifies "various social media accounts" as only "potentially Owned Intellectual Property," and in any case notes those accounts are not "Material to the Business." JX (APA) at 197, ECF No. [144-4].

### G. Foreign Trademark Registrations

On March 27, 2019, Santamarta filed an application to register the GlutaDose Mark in the Dominican Republic in his own name. Day 5 Trial Tr. at 60:12-61:1. On September 3, 2019, Santamarta applied for and ultimately registered the GlutaDose Mark in Mexico in his own name. *Id.* at 58:15-59:5. On June 19, 2019, Santamarta applied to register the GlutaDose Mark in Venezuela in his own name. *Id.* at 68:6-13. At some point after September 17, 2020, Santamarta withdrew the trademark registration application in Venezuela. *Id.* Afterward, Upharven, a Venezuelan company, applied to register the GlutaDose Mark and it was registered in Upharven's name. *Id.* at 68:4-6.

On February 26, 2020, Unipharma applied for a trademark registration for "UNIPHARMA GLUTADOSE" in the European Union. Day 6 Trial Tr. at 42:25-43:5, ECF No. [153]. That application was listed as Intellectual Property in Schedule 4.9(a) of the APA, described below. APA at 187. Oppositions to the European Union application were filed and the application was subsequently denied. Day 6 Trial Tr. at 40:15-20. Thereafter, the UNIPHARMA GLUTADOSE application was abandoned. Day 6 Trial Tr. at 43:5-11. On September 11, 2021, Santamarta applied for the GlutaDose Mark in the European Union and obtained a registration for that Mark. *Id.* at 43:12-17.

### H. Trademark License Agreement

On September 13, 2019, Unipharma and Bio Dose entered into a Trademark License Agreement. JX 2 (TLA) at 1, ECF No. [144-1]. Under the TLA, Unipharma granted Bio Dose a

limited, royalty-free, and exclusive license, with no right to sublicense. *Id.* The TLA provides that the license may be terminated by Unipharma "at any time based upon a breach of this Trademark License Agreement that is not reasonably cured 90 days after [Bio Dose] receives written notice thereof." *Id.* Moreover, under the TLA, Bio Dose acknowledged that Unipharma was "the owner of the Mark and that [Unipharma] retain[ed] all ownership rights . . . . [and] [a]ll usage of the name shall inure to the benefit of [Unipharma]." *Id.*

## I. Bankruptcy Court Order

Unipharma relied on significant financing from U.S. creditors. PTS at 16. Morgan Stanley, one of its creditors, provided it with a $60 million loan. Day 2 Trial Tr. at 145:20-21, ECF No. [149]. In October 2020, Morgan Stanley called the loan, changed Unipharma's board of directors, and installed Alan Petro, who had served as Unipharma's Vice President of Operations starting July 2020, as CEO. *Id.* at 145:20-146:10. Santamarta was removed from the company. *Id.* at 146:17-25.

On December 7, 2020, Unipharma filed for Chapter 11 bankruptcy. PTS at 16. Bio Dose and Santamarta were both listed as creditors and participated in the Bankruptcy through legal counsel. Day 4 Trial Tr. at 11:15-22. On January 29, 2021, the bankruptcy court entered an order approving the Bankruptcy Sale of Unipharma's assets free and clear to an entity, New Vision Pharmaceuticals, LLC, f/k/a NHTV (AIV) ULM Bidco, LLC ("New Vision"). JX 6 (Bankr. Court Order), ECF No. [144-6].

The Bankruptcy Court Order states:

Other than the Assumed Liabilities, the Purchaser is not assuming nor shall it or any Affiliate of the Purchaser be in any way liable or responsible, as a successor or otherwise, for any Liabilities of the Debtors in any way whatsoever, including any Liabilities relating to or arising from the Debtors' ownership or use of the Purchased Assets prior to the Closing Date, or any Liabilities calculable by reference to the Debtors or their operations or the Purchased Assets, or relating to continuing or other conditions existing on or prior to the Closing Date, which

Liabilities are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Purchaser or any affiliate of the Purchaser.

Bankr. Court Order at 23, ECF No. [144-6]. "Assumed Liabilities" has the meaning set forth in Section 2.3 of the APA, described below.

The Bankruptcy Court Order further states that "all persons presently or on or after the Closing Date in possession of some or all of the Purchased Assets are directed to surrender possession of the Purchased Assets to the Purchaser, as applicable, on the Closing Date or at such time thereafter as the Purchaser may request." Bankr. Court Order at 24, ECF No. [144-6]. The Order states that "no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the Transactions contemplated in or by the Agreement or this Order." *Id.* at 21.

**J.   Asset Purchase Agreement**

New Vision entered into the APA as the "Buyer;" and Unipharma and an entity, Tamarac 10200, LLC (Tamarac) agreed to the APA as the "Sellers" with another entity, NHTV ULM Holdings LLC agreeing to perform as the "Lender". *See* APA at 1. The APA defines the following terms:

> "Acquired Intellectual Property" shall mean, collectively, all Owned Intellectual Property and Licensed Intellectual Property. . . .
>
> "Confidential Information" shall mean all information in any form or medium that relates to the Business, the Purchased Assets or the Assumed Liabilities, including financial information, projections, pricing structures, technical data, trade secrets, know-how, ideas, inventions, designs, research, development plans, identities of, and arrangements with, customers and suppliers, software and databases, but shall not include any information that (i) at the time of disclosure thereof is generally available to the public (other than as a result of disclosure in violation of this Agreement), or (ii) is independently developed by the receiving party following the Closing Date without reliance on or use of any Confidential Information. . . .
>
> "Intellectual Property" shall mean all intellectual property and industrial property, whether protected, created or arising under the Laws of the United States or any other jurisdiction, including all: (i) patents and patent applications, all continuations, divisionals, and continuations-in-part of any of the foregoing, all patents issuing on any of the foregoing, and all reissues, renewals, substitutions,

reexaminations and extensions of any of the foregoing (collectively, "Patents"); (ii) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, corporate names, trade styles, logos and other source or business identifiers and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations, renewals and extensions of any of the foregoing (collectively, "Marks"); (iii) internet domain names; (iv) copyrights, works of authorship, and all mask work, database and design rights, whether or not registered or published, all applications, registrations, reversions, extensions and renewals of any of the foregoing, and all moral rights, however denominated (collectively, "Copyrights"); (v) trade secrets and other confidential or proprietary information (collectively, "Trade Secrets"); (vi) rights of publicity, persona rights or other rights to use indicia of any Person's personality; and (vii) Technology and other intellectual property or industrial property rights arising from or relating to any Technology. . . .

"Licensed Intellectual Property" shall mean all Intellectual Property (other than Owned Intellectual Property) used, held for use or practiced in connection with the Business. . . .

"Owned Intellectual Property" shall mean all Intellectual Property owned or purported to be owned by any Seller. . . .

"Purchased Assets" shall mean all right, title and interest of each of the Sellers in, to and under all of the assets, properties, interests, rights and claims of the Sellers (whether owned, leased, licensed, used or held for use by the Sellers), wherever situated and of whatever kind and nature, real or personal, tangible or intangible, and whether or not reflected on the books and records of the Sellers, including the assets, properties, rights and claims described in Section 2.1, other than the Excluded Assets. . . .

"Technology" shall mean all technology, formulae, algorithms, procedures, processes, methods, techniques, ideas, know-how, creations, inventions (whether patentable or unpatentable and whether or not reduced to practice), discoveries, improvements, product, servicing, business, financial and supplier information and materials, specifications, designs, models, devices, prototypes, schematics and development tools, Software, websites, recordings, graphs, drawings, reports, analyses and other writings and other tangible embodiments of any of the foregoing, in any form or media whether or not specifically listed in this definition.

APA at 7, 10, 13, 15, 16, 18, 20.

The APA provides that "at the Closing, . . . the Sellers shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept . . . all of the right, title and interest . . . free and clear of all Liens (other than Permitted Liens), in . . . all of the Purchased

Assets." *Id.* at 22. The Purchased Assets include Intellectual Property. *Id.* at 37. Schedule 4.9(a)

of the APA lists the Intellectual Property, which includes the GlutaDose Mark. *Id.* at 182. The

APA provides in Schedule 4.9(d) that

> To the Knowledge of the Sellers, none of the following are Material to the Business:
> 1. Bio Dose continues to use Owned Intellectual Property, including trademarks, branding templates, and order templates.
> 2. Members of the Santamarta family and their Affiliates continue to use various social media accounts, including Linkedin [*sic*], Instagram, Twitter, and Facebook, that are potentially Owned Intellectual Property.

APA at 197.

The APA further provides that, "[p]rior to Closing, [Unipharma and Tamarac] shall . . .

terminate all prior arrangements or agreements . . . between [themselves] and Bio Dose . . . as

applicable, and . . . use commercially reasonable efforts to enter into a new Contract in writing

between Unipharma and [Bio Dose] on terms reasonably acceptable to [New Vision] and

Unipharma." *Id.* at 58. The Bankruptcy Sale closed on February 11, 2021. PTS at 17.

Section 2.3 of the APA, on Assumed Liabilities, provides:

> On the terms and subject to the conditions set forth in this Agreement and the Sale Order, and subject to the exclusions set forth in <u>Section 2.4</u> (and in the event of any conflict between the exclusions set forth in <u>Section 2.4</u> and the provisions of this <u>Section 2.3</u>, the exclusions set forth in <u>Section 2.4</u> shall prevail), as partial consideration for the Purchased Assets, Buyer shall, on and after the Closing, assume and thereafter timely pay and perform only the following Liabilities of the Sellers (the "Assumed Liabilities").

APA at 25.

Section 2.4, titled Excluded Liabilities, reads

> Notwithstanding anything to the contrary set forth herein, Buyer shall not assume, and shall not be deemed to have assumed, and the Sellers shall be solely and exclusively liable with respect to, all Liabilities of any Seller or any of its Affiliates or any of their respective predecessors other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Buyer shall not be obligated to assume, nor assumes, and Buyer hereby disclaims, all of the Excluded Liabilities, including all of the following Liabilities of any Seller or any of its Affiliates[.]

*Id.* at 26.

Excluded Liabilities include "any Liability of any Seller arising out of this Agreement or any agreement ancillary or related hereto", "any Liabilities arising out of or relating to the Business, the Purchased Assets or the ownership, operation or conduct thereof prior to the Closing", and "any Liabilities arising as a result of any Contract or arrangement . . . with or binding upon any of the Sellers and any Related Party and all intercompany payables owed from one Seller to the other Seller". *Id.* at 27. "Liabilities" are further defined as

> to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, asserted or unasserted, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records, including any liability for Taxes.

*Id.* at 15.

### K. Bio Dose Purchased GlutaDose Products from Alchemy Valley

From December 2, 2020 through August 18, 2021, Unipharma and thereafter New Vision sold GlutaDose Products to a third company, Alchemy Valley, LLC ("Alchemy Valley"). Day 3 Trial Tr. at 98:20-25, 99:1-7, ECF No. [150]. During that time, there were five separate sales of GlutaDose Products to Alchemy Valley, first by Unipharma and then by New Vision, following the closing of the bankruptcy sale of assets. *Id.* at 98:24-99:7, 101:9-105:17; *see also* PX 43, ECF No. [155-20]; Defs.' Ex. (DX) 11, ECF No. [145-2]; DX 12; ECF No. [145-3]; DX 13 ECF No. [145-4]; DX 14, ECF No. [145-5]; DX 15, ECF No. [145-6]; DX 16 ECF No. [145-7]; DX 17, ECF No. [145-8]; DX 18, ECF No. [145-9]; DX 24, ECF No. [145-10]; DX 25, ECF No. [145-11].

For instance, on December 2, 2020, Bio Dose purchased 3,000 units of GlutaDose Products from Alchemy Valley for $77,040.00. PX 43 at 33. On December 7, 2020, Bio Dose also purchased

$80,040.00 of GlutaDose Products from Alchemy Valley. *Id.* at 30.[2] On July 23, 2021, Bio Dose purchased 9,600 units of GlutaDose Products from Alchemy Valley for $125,760.00. *Id.* at 42.

Bio Dose continued to purchase GlutaDose Products from Alchemy Valley until August 16, 2021. *Id.* at 44. The head of Alchemy Valley represented to Petro that Alchemy Valley sought to sell GlutaDose Products in Colombia. Day 3 Trial Tr. 11:12-20. Petro testified that New Vision stopped selling to Alchemy Valley when it learned that the sold GlutaDose Products traveled to a Bio Dose Facility. *Id.* at 11:25-12:24. Petro testified that New Vision wanted a licensing agreement in place with Bio Dose to ensure quality control and because he suspected that Bio Dose could "create significant harm to the value of the trademark if they wanted to." *Id.* at 13:19-14:1.

### L.  Bio Dose Also Purchased GlutaDose Products from Unipharma

Between January 29, 2021 and February 11, 2021, Bio Dose purchased GlutaDose through eleven transactions totaling $576,103.00. Day 3 Trial Tr. at 60:1-77:17; PX 42, ECF No. [155-19].[3] Petro negotiated those sales. Day 3 Trial Tr. at 77:3-12. An invoice dated January 29, 2021 reflects that Unipharma sold to Bio Dose 258 or 259 units of "Unipharma GlutaDose Guard 10mL 12 ct" product. PX 42 at 220.

---

[2] The quantity of GlutaDose Products listed in the relevant invoice is covered by a bank receipt.

[3] The Court calculated this total by adding the amounts on the invoice subtotals in Plaintiff's Exhibit 42: $148,608.00 + $40,320.00 + $20,160.00 + $20,160.00 + $4,284.00 + $113,148.00 + $74,340.00 + $22,118.40 + $629.20 + $73,440.00 + $58,896.00 = $576,103.00. The following table summarizes the data used by the Court for its calculation.

|   | CM/ECF Page No. (PX 42) | Sales Order Number | Sales Order Date | Quantity (assorted GlutaDose products) | Subtotal Due | Total Due |
|---|---|---|---|---|---|---|
| 1 | 220 | 1134 | 1/29/21 | 860 | $148,608.00 | 148,608.00 |
| 2 | 232 | 182091 | 2/2/21 | 459 | $40,320.00 | 0.00 |
| 3 | 233 | 182093 | 2/3/21 | 409 | $20,160.00 | 0.00 |
| 4 | 234 | 182103 | 2/4/21 | 409 | $20,160.00 | 0.00 |
| 5 | 235 | 182105 | 2/5/21 | 868 | $4,284.00 | 4,284.00 |
| 6 | 236 | 182106 | 2/5/21 | 1,067 | $113,148.00 | 113,148.00 |
| 7 | 237 | 182107 | 2/5/21 | 656 | $74,340.00 | 74,340.00 |
| 8 | 238 | 182108 | 2/5/21 | 259 | $22,118.40 | 0.00 |
| 9 | 239 | 182109 | 2/5/21 | 435 | $629.20 | 691.20 |
| 10 | 240 | 182116 | 2/11/21 | 425 | $73,440.00 | 73,440.00 |
| 11 | 241 | 182115 | 2/11/21 | 409 | $58,896.00 | 58,896.00 |
|   |   |   |   | 6,256 | $576,103.60 |   |

The evidence presented at trial included packing slips for the shipments from those sales. One packing slip dated February 11, 2021, indicates that Bio Dose received 409 units of GlutaDose Product with lot number 2020-00109. *Id.* at 226.

On May 27, 2021, New Vision issued a customer statement to Bio Dose for $6,945.27 and Bio Dose issued a payment to New Vision in that same amount. PX 18, ECF No. [155-6]. Perez testified that the customer statement and payment referenced in Plaintiff's Exhibit 18 related to the balance of Unipharma invoice 182116 and interest on invoices 182115 and 182116. Day 7 Trial Tr. at 122:4-8, 17-20; 123:5-24; 124:4-8. However, each of those invoices was dated February 11, 2021, the date of the closing of the bankruptcy sale. *See* PX 42 at 240, 241.

### M. GlutActive Mark

Santamarta worked with a company to develop a nutritional supplement that Santamarta's daughter Yohana named "GlutActive." Day 5 Trial Tr. at 31:22-33:3. GlutActive is a glutathione-based product that is different from GlutaDose Products and competes in the same market as those products. Day 7 Trial Tr. at 41:16-45:11. Bio Dose is its exclusive distributor. Day 4 Trial Tr. at 10:1-15.

An application for the GlutActive Mark was filed on March 23, 2021 and the GlutActive Mark was registered on December 7, 2021. JX 8, ECF No. [144-8].

### N. Cybersquatting Lawsuit

On July 2, 2021, New Vision demanded that Bio Dose "take down" the Website. JX 14 at 2. New Vision further advised that "[a]s a result of your actions and given that these violations are incurable, **New Vision hereby terminates the trademark license**." JX 14 at 2 (emphasis in original). New Vision also demanded, among other things, that Defendants cease selling GlutaDose Products and destroy any remaining inventory. JX 14 at 2, ECF No. [144-14].

On September 9, 2021, New Vision filed a lawsuit against Bio Dose for alleged cybersquatting, in part because Defendants improperly retained "part of the IP and the assets that were sold" to New Vision. *Id.* at 7:5-13; PTS at 18; JX 3, ECF No. [144-3]. Later, the domain www.glutadose.com was delivered to New Vision, Day 3 Trial Tr. at 9:14-16, and the lawsuit was dismissed without prejudice, PTS at 18.

### O.  Manufacturing and Supply Agreement

On December 17, 2021, Nutradose and New Vision entered into the Manufacturing and Supply Agreement and Purchase Agreement. Def.'s Ex. (DX) 3 (MSAPA), ECF No. [145-1]. Under that agreement, Nutradose purchased the Mark and brand for consideration. MSAPA at 7. On February 8, 2022, New Vision recorded a document with the United States Patent and Trademark Office titled Trademark Assignment purporting to assign the GlutaDose trademark to Nutradose. PTS at 18.

### P.  Customer Complaints

The evidence presented at trial includes customer complaints. PX 17, ECF No. [155-5]. The complaints cover a period from January 3rd to August 17, 2022 and were submitted in the form of trouble tickets which are viewable on https://nutradose.zendesk.com/. Customers who purchased GlutaDose Products generally expressed concern that the products were past their expiration date. Customers based those assertions on the manufacturing date that appeared on the individual vials of GlutaDose. *See, e.g., id.* at 1 (ticket dated August 17, 2022 showing GlutaDose Products with "M 03/20" on the label). In one instance, a customer asked for the expiration date of a GlutaDose Product with lot number L00109 and manufacturing date of January 2020. *See id.* at 11 ("today I purchased Glutadose Inmune [*sic*] whose packaging and vials indicate lot L00109 and the manufacturing date M01/20. Could you please tell me what would be the expiration

date?"). In another case, another customer stated, "I placed an order for 'GlutaDose Guard' and received a page [*sic*] that has already expired." *Id.* at 3.

The Court admitted Plaintiff's Exhibit 17 as evidence of consumer confusion. However, that evidence is relevant only to the extent it shows that customers mistakenly assumed they had purchased GlutaDose Products *from Nutradose*. Other evidence at trial supported that those customers adopted that assumption. Gonzalez testified that sellers on the Amazon platform were selling "GlutaDose® Guard 12ct" as of late October 2022. Day 1 Trial Tr. 105:23-106:3; PX 41, ECF No. [155-18]. That testimony was relevant to the scope of distribution of GlutaDose® Guard 12 ct. Day 1 Trial Tr. at 107:11-18. Gonzalez testified that Nutradose did not sell that product because, according to him, the product was past its shelf life and Nutradose had stopped selling that product. *Id.* at 103:18-24. Gonzalez further testified that Nutradose had not sold the product to any of the Amazon sellers. *Id.* at 104:10-12.

Notably, Unipharma had previously sold at least 258 or 259 units of "Unipharma GlutaDose Guard 10mL 12 ct" on January 29, 2021, the same product of which the customers complained. PX 42 at 220. Considering Gonzalez's testimony, the evidence of Bio Dose's purchases of GlutaDose Products from December 7, 2020 through February 11, 2021, and the customer complaints, and seeing no evidence to the contrary, the Court finds that the customers who complained on https://nutradose.zendesk.com/ indeed assumed Nutradose had sold them GlutaDose Guard and did so mistakenly. The Court also finds that Bio Dose sold GlutaDose Products to the customers either directly or indirectly through Amazon sellers GlutaDose Guard, which Bio Dose obtained in the period from December 7, 2020 through February 11, 2021.

### Q. GlutActive Inserts

Having registered the GlutActive Mark five months earlier, in April 2022, Defendants inserted marketing materials for their competing glutathione-based product, GlutActive, into the

shipping boxes containing GlutaDose Products. Day 6 Trial Tr. at 9:15-18; PX 36, ECF No. [155-16]. The inserts included a letter from Santamarta, a sample of the GlutActive product, and multiple pamphlets promoting GlutActive, one of which contained a picture of Santamarta. PX 36 at 2. In the letter, Santamarta stated: "The purpose of this letter is to greet you and especially to thank you for your loyalty to using GlutaDose, a product developed and created by me and a team of professionals who have worked for decades developing medicines." *Id.* at 11.

Since the GlutActive inserts were shipped together with GlutaDose Products, the inserts create the impression that Bio Dose sells GlutaDose Products as the owner of the GlutaDose Mark and that it is advertising GlutActive as a product that is newer than and an improvement upon GlutaDose Products.

### R.  Bio Dose's Profits

Gonzalez prepared a calculation of Bio Dose's profits from its GlutaDose Product sales, PX 47, ECF No. [155-21], and testified regarding that calculation. Day 1 Trial Tr. at 120-143. He testified that he took the sales data on all sales of GlutaDose Products made by Bio Dose and calculated revenues for each type of GlutaDose Product. *Id.* at 128-137. Gonzalez calculated Defendants' sales as $2,788,771.00. PX 47. For purposes of finding costs related to the sale of GlutaDose Products, Mr. Gonzalez testified that he was unable to pinpoint a cost per product from Defendants' financials, and he used the current cost per box of GlutaDose Products, which he testified would result in a lower profit calculation than Defendants' actual profits. Day 1 Trial Tr. at 137-139. Nutradose calculated Defendants' costs as $1,450,922.00. PX 47.

Perez testified that there were additional costs that were not included in Nutradose's calculations, including costs directly related to the sale of the product on Amazon, Walmart, and WooCommerce, as well as shipping charges, advertising costs, labor, office supplies, office software, phone services, repairs, rentals, lease, security system, taxes, and utilities. Day 7 Trial

Tr. at 138:25-140:8. Perez submitted profit and loss statements for Bio Dose that reflected those

costs. JX 12, ECF No. [144-12]; JX 15, ECF No. [144-14]; Day 7 Trial Tr. at 128:5-6, 131:11-12.

In particular, Perez testified as follows:

> BY [Counsel for Defendants]:
> Q. Mr. Perez, you have the profit and loss statements for 2021 and 2022 in front of
> you, correct?
> A. Yes, sir.
> Q. Do these reflect additional costs relating to the sale of GlutaDose products
> during those years?
> A. Yes. For sure.

Day 7 Trial Tr. at 138:25-139:5.

Perez also testified that "95-97%" of the costs on the profit and loss statements in 2021

were related directly to the sale of GlutaDose Products and the additional costs for that year totaled

$800,00 – $850,000. Day 7 Trial Tr. at 141:1-8. Perez testified that in 2022, 40% of the costs were

related directly to the sale of GlutaDose Products and the additional costs for 2022 were

approximately $400,000. *Id.* at 141:9-25.

As the Court recalls Perez's testimony, the profit and loss statements that Perez prepared

list only sales for GlutaDose Products but also include expenses for all the products that Bio Dose

was selling in 2021 and 2022. The trial transcript confirms this recollection:

> Q. So -- okay. So I just -- thank you for that. I want to make sure that in the three
> profit and losses we'll be discussing, all the expenses -- the expenses you included
> were all the expenses, not just GlutaDose. And in the gross sales, you only included
> the gross sales of GlutaDose, correct?
> A. Yes, sir. That is correct. And may I give you some additional information?

*Id.* at 149:5-11.

However, Perez's testimony was vague. It is not clear how Bio Dose's costs arise from the

data profit and loss statements. In other words, it is unclear from the testimony and the Court's

review of Joint Exhibits 12 and 15 how Perez obtained the percentages he used to apportion the

expenses in the profit and loss statements to obtain Bio Dose's costs for only selling GlutaDose

Products for 2021 and 2022. Perez's testimony indicates that he was making back-of-the-envelope calculations in arriving at those percentages. Moreover, it is unclear why Perez's calculation of costs does not incorporate the per cost of GlutaDose Products that Gonzalez testified on. Given that lack of clarity, the Court cannot place any weight on Perez's testimony on this issue. However, since Nutradose concedes that Bio Dose's relevant costs are at least $1,450,922.00, the Court finds that Bio Dose's profits with respect to its GlutaDose sales from February 11, 2021 and October 30, 2022 were $1,337,848.00.

### S.  Nutradose's Costs

Gonzalez testified that Nutradose incurred $92,000.00 in costs to rebrand its GlutaDose Products, i.e., costs from creating "a different name, different color, packaging, different everything, except what's inside", based on concerns over GlutaDose Products being sold past their expiration date.  Day 1 Trial Tr. at 152:6-153:1.

Gonzalez further testified that Nutradose would have to spend $80,000.00 to recover the number of followers that it had lost on the Instagram platform on account of Santamarta's decision to delete or rename the GlutaDose Instagram accounts. *Id.* at 158:25-159:12.

### T.  Loss of Goodwill

Gonzalez testified that he calculated Nutradose's loss of goodwill in the GlutaDose Mark by taking projected revenues of GlutaDose Products, which he estimated at $4 million, applying a weighted average gross profit margin of 58 percent, to reach $2.3 million in profits per year. *Id.* at 156:12-158:4. Gonzalez then subtracted $1,000,000.00 in advertising expenses and $200,000.00 in other expenses for a net profit of $1,140,000.00 per year. *Id.* Estimating a year and six months to repair the goodwill, Gonzalez derived the $1,710,000.00 figure. *Id.*

Defendants contend the $4 million dollar figure is speculative and should not be credited. ECF No. [157] at 155-56. However, as Defendants acknowledge, that calculation was based on

sales of $400,000.00 in a one-month period in March 2020. Day 2 Trial Tr. at 104:16-22. As such, Gonzalez's goodwill calculations have a basis in fact, and Defendants presented no contrary evidence on the loss in the value of goodwill. Moreover, the case on which Defendants rely for the proposition that Gonzalez's goodwill loss calculation is speculative, *see* ECF No. [157] at 156, supports the opposite conclusion. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S. Ct. 248, 250, 75 L. Ed. 544 (1931) ("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, *not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount*.") (emphasis added).

### III.   CONCLUSIONS OF LAW

Having made its findings of fact, the Court below sets forth its conclusions of law.

### A.   Jurisdiction and Venue

This Court has original jurisdiction over the action pursuant to 28 U.S.C. §§1331, 1338(a) and 1338(b) for the counts arising under federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for the counts arising under state law. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside and do business in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

### B.   Counts I, II, and III (Trademark Infringement)

The Lanham Act aims to protect both consumers and registered trademark owners by preventing consumer confusion over the quality and nature of those products through ensuring that (1) all products sold under a registered mark retain the same "special characteristics" that consumers expect from products associated with that mark and that (2) others do not erode the goodwill in a registered trademark that an owner has spent time, energy and money developing by

changing those characteristics. *See Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300-01 (11th Cir. 2001).

As to Count I, "Trademark infringement under the Lanham Act occurs when a defendant, without consent, uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark' that 'is likely to cause confusion' that a relationship exists between the parties." *FCOA LLC v. Foremost Title*, 57 F.4th 939, 946 (11th Cir. 2023) (citing 15 U.S.C. §1114(1)). "For a trademark infringement claim, a plaintiff must demonstrate (1) that it owns a valid mark with priority, and (2) that the defendant's mark is likely to cause consumer confusion with the plaintiff's mark." *Id.* To prevail on a claim for trademark infringement pursuant to 15 U.S.C. § 1114(1)(a), Nutradose must show that: (1) Nutradose has a valid, protectable mark with priority; and (2) Defendants' use of the mark is "likely to cause consumer confusion with the plaintiff's mark." *Id.*; *see also TracFone Wireless, Inc. v. SND Cellular, Inc.*, 715 F. Supp. 2d 1246, 1255 (S.D. Fla. 2010) (holding that "in order to prevail on a claim of trademark infringement under Sections 32 and 43 [of the Lanham Act], [a plaintiff] must demonstrate that (1) it has a valid, protectable mark and (2) that defendants' use of the mark is 'likely to cause confusion, or to cause mistake, or to deceive.'"); *see also* PTS at 20-21.

As for Count I, to prevail on a claim for unfair competition and false designation of origin under 15 U.S.C. § 1125(a), Nutradose must show "(1) that it has trademark rights in the mark or name at issue" and "(2) that the defendant adopted a mark or name that was the same, or confusingly similar to the plaintiff's mark, such that there was a likelihood of confusion for consumers as to the proper origin of the goods created by the defendant's use of the [plaintiff's] name in his trade." *See Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512 (11th Cir. 1984); *see also* 15 U.S.C. § 1125(a) (providing in pertinent part that any person who uses "any false designation

of origin . . . which . . . is likely to cause confusion . . . or to deceive as to affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods . . . by another person" is liable in a civil action to the other person); *Savannah Coll. of Art & Design v. Sportswear, Inc.*, 983 F.3d 1273, 1279 (11th Cir. 2020) (explaining that trademark owner "needed to show enforceable trademark rights in its marks used by [defendant]. And second, it had to prove that [defendant's] unauthorized use of its marks was likely to confuse consumers."); PTS at 21.

As to Counts III and V, "[t]he analysis under the Lanham Act for trademark infringement also applies to claims of (1) trademark infringement and (2) unfair competition under Florida common law." *GLD, LLC v. Gold Presidents, LLC*, No. 20-cv-21617, 2021 WL 3110012, at *5 (S.D. Fla. July 22, 2021) (citation omitted); *FCOA, LLC v. Foremost Title & Escrow Services, LLC*, 416 F. Supp. 3d 1381, 1388 n.4 (S.D. Fla. 2019) (citing *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 899 F.2d 1018, 1025-26, n.14 (11th Cir. 1989) (recognizing that the elements of common law and statutory trademark infringement are the same and that a claim of unfair competition premised on an alleged trademark infringement is "practically identical" to an infringement claim)); *see also* PTS at 21-22.

### i. Valid Protectable Mark

A certificate of registration issued by the United States Trademark and Patent Office is "'prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark . . . .'" *TracFone Wireless, Inc.*, 715 F. Supp. 2d at 1255 (citing 15 U.S.C. § 1057(b)). In the Eleventh Circuit, there is a strong presumption that registered marks are valid. *Id.* (citing *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1562 (11th Cir. 1991)).

The GlutaDose Mark was registered on December 24, 2019, obtaining U.S. Registration Number 5,945,760. JX 1. Plaintiff is listed as the last owner of the GlutaDose Mark, and the Mark is "LIVE". Accordingly, Nutradose is the owner of the GlutaDose Mark, which is valid and protectable.

### ii.   *Likelihood of Confusion*

The Eleventh Circuit generally considers seven factors to determine whether there is a likelihood of confusion: (1) the type of mark; (2) the similarity of the marks; (3) similarity of the products the mark represents; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media used; (6) defendants' intent; and (7) actual confusion. *See Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989). "There are no hard and fast rules as to how much evidence of confusion is enough. Rather, when looking at the evidence the reviewing court must take into consideration the circumstances surrounding each particular case." *Id.* at 326 n.3 (citing *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 844 (11th Cir. 1983)).

Nutradose cites *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1359 (S.D. Fla. 2017) to argue that the Court need not consider the enumerated factors because Defendants made a concurrent use of the GlutaDose Mark, meaning that "consumer confusion is presumed." ECF No. [156] at 69. However, that case involved the use of a registrant's trademark to sell *counterfeit* goods. Specifically, an ex-licensee of the trademark at issue in that case used that mark in conjunction with eyewear products in violation of the Lanham Act when it continued to create, manufacture, and sell substantially similar, if not identical, products, to the same customers, in the same markets, as the trademark owner, without owner's permission after its license to do so had expired. *See Casa Dimitri Corp.* 270 F. Supp. 3d 1340 at 1359-60 (finding no genuine issue of material fact regarding the likelihood of confusion given the "overwhelming

evidence that Defendants have used the [ex-licensor's] Technomarine Marks to create, manufacture and sell substantially similar, if not identical, eyewear products, which they sell to the same customers and in the same markets as [the ex-licensee].") Here, Bio Dose did not manufacture its own GlutaDose Products; Rather, based on the purchase orders admitted at trial, there is no question that Bio Dose resold genuine GlutaDose Products. That factual distinction persuades the Court that *Casa Dimitri* does not support that consumer confusion may be presumed here.

Nutradose also argues, while also relying on *Casa Dimitri*, that confusion is assumed as a matter of law because Bio Dose is an ex-licensee of the GlutaDose Mark. However, *Casa Dimitri* did not rely on that presumption in finding that there was a likelihood of confusion. For these reasons, the Court proceeds to consider the seven factors.

### a. Type of Mark

First, when analyzing the type of mark, courts determine the level of protection to be afforded based on the mark's strength. *TracFone Wireless, Inc.*, 715 F. Supp. 2d at 1255. Marks can be grouped into one of four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary. *Id.* Arbitrary marks—marks that bear no relationship to the product—are the strongest type of mark and entitled to the greatest protection. *Id.* (citing *Frehling Enterprises, Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999)). Suggestive marks suggest characteristics of the goods and are also strong marks entitled to protection. *Frehling Enterprises, Inc. v. Int'l Select Group, Inc.*, 192 F.3d at 1335. Some courts hold that fanciful trademarks are also in the fourth category and thus afforded maximum protection. *See Rolex Watch U.S.A., Inc. v. Canner*, 645 F. Supp. 484, 488 (S.D. Fla. 1986) (holding "that Rolex is properly classified as an 'arbitrary' or 'fanciful' trademark which is considered strong and is given 'protection over a wide range of related products and variations in appearance of the mark.'" (citing *John H. Harland Co.*

*v. Clarke Checks, Inc.*, 711 F.2d 966, 974 (11th Cir. 1983) (quoting 1 J. McCarthy, Trademarks & Unfair Competition § 11.24, at 398 (1973)))).

The GlutaDose Mark is fanciful because the word "GlutaDose" is not a pre-existing English word. Rather, it is a portmanteau that combines the prefix "gluta" and the base word "dose." The component "gluta" does not have independent meaning and is ostensibly a truncation of the word "glutathione," and there is no trial evidence that the prefix "gluta" is used, perceived, or understood by the relevant consumer as a term that means *glutathione.* Accordingly, the word "GlutaDose" is fanciful.

The use of the mark by third parties is also an important consideration in analyzing this factor: the lower the extent to which third-parties use the mark, the greater the mark's strength. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974 (11th Cir. 1983) (explaining that the extent of third-party use of the mark is important in considering the strength of a mark). Additionally, there was no evidence of third parties using the GlutaDose Mark who were not Amazon resellers with whom Defendant sold GlutaDose Products. Accordingly, the GlutaDose Mark is a strong mark entitled to protection, and this factor weighs in favor of finding likelihood of confusion.

#### b.   Similarity of the Marks

Second, the Court "compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling Enters., Inc.*, 192 F.3d at 1337 (citation omitted). Here, because this case involves concurrent use of an identical mark, the Court finds that this factor weighs in favor of finding likelihood of confusion.

### c.   Similarity of the Products the Mark Represents

Third, the Court compares the similarity between the parties' products and "[t]he greater the similarity between the products and services, the greater the likelihood of confusion." *TracFone Wireless, Inc.*, 715 F. Supp. 2d at 1256 (quoting *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985)). Here, the Court finds that because Defendants are selling the same GlutaDose Products that Nutradose is selling, this factor weighs in favor of finding likelihood of confusion.

### d.   Similarity of the Parties' Retail Outlets and Customers

Fourth, the Court takes into consideration "where, how, and to whom the parties' products are sold." *See TracFone Wireless, Inc.*, 715 F. Supp. 2d at 1256 (citing *Frehling Enters., Inc.*, 192 F.3d at 1339). The evidence presented at trial established that GlutaDose Products are sold primarily on Amazon, with some additional sales being made through Walmart and each Party's respective website. JX 13; PX 13, ECF No. [155-4]; PX 31; PX 32; PX 33; Day 1 Trial Tr. 105:23-106:3; PX 41, ECF No. [155-18]; Day 7 Trial Tr. at 138:25-140:8. Given that evidence, the Court finds that this factor favors finding likelihood of confusion.

### e.   Similarity of Advertising Media Used

Fifth, the Court considers each party's method of advertising. *Frehling Enterprises, Inc.*, 192 F.3d at 1339. The evidence presented at trial established that both Nutradose and Defendants advertise primarily on the internet, and therefore, the Court finds that this factor weighs in favor of finding likelihood of confusion. *See TracFone Wireless, Inc.*, 715 F. Supp. 2d at 1257 (holding that this factor weighed towards a finding of likelihood of confusion because "[d]efendants, just like [plaintiff], advertise on the internet."). Furthermore, this factor also weighs in favor of finding likelihood of confusion because the Court found that the Website contained a link to Nutradose's Facebook page and Instagram Accounts, PX 11; Day 1 Trial Tr. at 68:5-69:5, and contained

renderings of the GlutaDose Products. Joint Ex. 11. Thus, this is a case where Defendants improperly used Nutradose's social media accounts to advertise. Moreover, and crucially, the Website creates the false impression that Bio Dose is the originator of Nutradose's Glutadose Products,[4] and the GlutActive inserts made a misleading association between Santamarta as the creator of Bio Dose and the GlutaDose Mark.

Accordingly, this factor weighs heavily in favor of finding a likelihood of confusion.

### f. *Defendant's Intent*

Six, the Court considers whether "it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation." *See Frehling Enters., Inc.*, 192 F.3d at 1340. On this factor, the facts are clear that Defendants continued to use the GlutaDose Mark with the intention of catalyzing the launch of his competitor product, GlutActive, by leveraging goodwill in the GlutaDose Products. First, in the March 30, 2022 Email Thread, Santamarta asked counsel whether Bio Dose could "continue to use on the website images that have been there for three years and refer to GlutaDose". PX 49 at 2. Santamarta's question shows that Santamarta intended to use the GlutaDose Mark, which is contained in the images on the Website, to launch GlutActive, a product in competition with GlutaDose, that is supported by a later-registered mark, JX 8. Bio Dose is the exclusive distributor of GlutActive, Day 4 Trial Tr. At 101:1-15, and Bio Dose inserted promotional materials for GlutActive into boxes that it shipped to customers who ordered GlutaDose Products. *See* Day 6 Trial Tr. at 9:15-18; PX 6. Those materials thank Bio Dose's customers for their "loyalty [for] using GlutaDose, a product developed and created by [Santamarta] and a team of professionals who have worked for decades developing

---

[4] Because the Court has found that the Website did not contain a disclaimer indicating that Nutradose was the GlutaDose Mark registrant, it does not reach the parties' arguments concerning whether that disclaimer was effective.

medicines." PX 36 at 11. That statement specifically shows that Defendants promoted GlutActive through GlutaDose Product sales, which necessarily entailed the use of the GlutaDose Mark.

As such, this factor also weighs heavily in favor of finding likelihood of confusion.

### g. Actual Confusion

"[E]vidence of actual confusion is the best evidence of a likelihood of confusion." *Frehling Enters., Inc.*, 192 F.3d 1330, 1340-41. At trial, Nutradose presented some evidence of actual confusion.[5] As the Court has explained, Gonzalez's testimony, together with the evidence of the purchase orders between Unipharma and Bio Dose, and the evidence of the customer complaints, shows that consumers mistakenly assumed that Nutradose sold them purportedly expired GlutaDose Products, and that Bio Dose sold the GlutaDose Products to third-party resellers that these customers complained of. As such, this factor weighs slightly in favor of a finding of a likelihood of confusion.

Because all the above factors favor a finding of a likelihood of confusion,[6] the Court concludes that Bio Dose's use of the GlutaDose Mark on the Website and in the GlutActive inserts were likely to cause consumer confusion. Specifically, Bio Dose falsely suggested on the Website that Bio Dose originates the GlutaDose Mark and misleadingly suggested that GlutaDose Products originate from Bio Dose and that GlutActive is a new and improved product based on Santamarta's purported invention of GlutaDose.

---

[5] Nutradose introduced the testimony of Adriana Mazzaglia to prove actual consumer confusion. The Court places little weight on her testimony because she is the sister-in-law of Nutradose's CEO, Xavier Perez Planas, and knows Melillo and Gonzalez, individuals associated with Nutradose. Day 4 Trial Tr. at 118:19-20, 126:20-25, 127:12-128:2. Moreover, although Mazzaglia's testimony indicated that she ordered a GlutaDose Product and found a GlutActive insert, and that she "didn't understand" it, her testimony was vague and did not support that she was confused as to whether GlutaDose Products originated from Bio Dose. *See id.* at 126:3-10.

[6] Even if the Court were to find there was no evidence of actual confusion, the other factors weigh in favor of finding a likelihood of confusion. *See E. Remy Martin*, 756 F.2d at 1529; *Montgomery v. Noga*, 168 F.3d 1282, 1302 (11th Cir.1999) ("[W]e have held that a plaintiff is not required to provide evidence of actual confusion in order to prove likelihood of confusion.").

### iii.     Santamarta's Liability for Trademark Infringement

"Natural persons, as well as corporations, may be liable for trademark infringement under the Lanham Act." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (citing *Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19 (5th Cir. 1968); (15 U.S.C. §§ 1114 & 1127). Personal liability for trademark infringement attaches to agents of a company if the individual "actively and knowingly caused the infringement," such that he was "a moving, active, conscious force." *Id.* at 1478; *see also* PTS at 22.

The Court finds Santamarta was the moving, active, and conscious force behind Bio Dose's trademark infringement. First, Defendant Santamarta sent the March 30, 2022 Email Thread, which detailed his intent to use images on the Website and GlutaDose shipments to promote GlutActive. PX 26. The evidence at trial revealed that Bio Dose continued to use those images, showing that Bio Dose followed Santamarta's intent. Second, Santamarta testified that he is the president, CEO, and sole manager of Bio Dose. Day 4 Trial Tr. at 7:16-24. Third, Defendant Santamarta testified that at Bio Dose "nothing happens behind his back." Day 6 Trial Tr. at 28:4-8. He also testified that he does "anything" at Bio Dose, even dry the rugs at the Bio Dose office when they get wet, indicating his deep involvement with Bio Dose's day-to-day operations. Day 6 Trial Tr. at 28:9-15. Perez also testified that he reports to Santamarta and that Santamarta is "the ultimate decision-maker at [Bio Dose]." Day 7 Trial Tr. at 101:22-102:1.

Accordingly, the Court finds that Santamarta is personally liable for Bio Dose's trademark infringement. *See Chanel, Inc.*, 931 F.2d at 1478 (affirming district court's finding that president and CEO of defendant corporation was personally liable where he was directly involved with the corporation's infringement, including by purchasing counterfeit goods, advertising the goods as

plaintiff's products in local publications; and operated the showroom from which the goods were sold).[7]

### iv.    *Defendants' Affirmative Defenses*

"[T]he defendant bears the burden of proof on his affirmative defenses at trial." *Off. of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997) (citing *Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1550-51 (11th Cir. 1990)). Accordingly, Defendants bore the burden of proving the affirmative defenses on which they were allowed to proceed at trial. For the following reasons, the Court finds Defendants failed to carry their burden with respect to those affirmative defenses.

### a.   *License Agreement*

Defendants asserted the affirmative defense of license at trial. In the Eleventh Circuit, "falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source *or sponsorship* constitutes infringement." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983) (quoting *Professional Golfers Ass'n of America v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975) (emphasis in original)). As such, Defendants raised the affirmative defense of license to prove that Defendants did not falsely suggest affiliation with Nutradose because a trademark license agreement would show that Bio Dose was authorized to use the GlutaDose Mark. *See* Fed. R. Civ. P. 8(c)(1) (listing license as an affirmative defense).

In its Omnibus Order, the Court found that the Bankruptcy Court Order terminated the TLA. *See* ECF No. [98] at 29-30, 56. Upon a review of the evidence presented at trial and the relevant case law, the Court sees no reason to depart from that finding.

---

[7] Defendants distinguish *Chanel* on the ground that that case involved counterfeit goods, which is not the case here. ECF No. [157] at 150. But the requirement that an individual be the "moving, active, conscious force" behind the infringement does not require that the infringement relate to counterfeit goods. *Chanel* is on point, so Defendants' argument fails.

The Bankruptcy Court Order provides that, "[o]ther than the Assumed Liabilities, [New Vision] is not . . . in any way liable . . . for any Liabilities of the Debtors in any way whatsoever, including any Liabilities relating to or arising from the Debtors' . . . use of the Purchased Assets prior to the Closing Date[.]" Bankr. Court Order at 23. "Liabilities" are defined as "all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, asserted or unasserted, absolute or contingent[.]" *Id.* at 15. The Purchased Assets include the GlutaDose Mark, the subject of the TLA, which gave Bio Dose the right to use the GlutaDose Mark, TLA at 1. *See* APA at 37 (identifying Intellectual Property as part of the Purchased Assets); *see also id.* at 182 (listing the GlutaDose Mark as Intellectual Property). "Assumed Liabilities" has the meaning set forth in Section 2.3 of the APA. Section 2.3 of the APA states that Excluded Liabilities are excluded from the Assumed Liabilities. *Id.* at 25-26. Excluded Liabilities include "any Liability of any Seller arising out of this Agreement or any agreement ancillary or related hereto", "any Liabilities arising out of or relating to the Business, the Purchased Assets or the ownership, operation or conduct thereof prior to the Closing", and "any Liabilities arising as a result of any Contract or arrangement . . . with or binding upon any of the Sellers and any Related Party and all intercompany payables owed from one Seller to the other Seller". *Id.* at 27.

The Bankruptcy Court Order sets forth that the "Liabilities are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Purchaser or any affiliate of the Purchaser." Bankr. Court Order at 23.

As such, the TLA is one of Unipharma's "liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever that arises" relating to or arising from Unipharma's use of the GlutaDose Mark prior to the closing date of the Bankruptcy Sale, namely, licensing that

mark to Bio Dose. Accordingly, to avail themselves of the license defense, Defendants had to show

that the TLA is an "Assumed Liability", but they did not do so. To the contrary, the TLA fits

squarely within the plain meaning of "Excluded Liabilities", meaning that New Vision did not

have to assume that agreement under the APA. It follows that the Bankruptcy Court Order

"extinguished" the TLA as a Liability of the Debtors "relating to or arising from the Debtors' . . .

use of the Purchased Assets prior to the Closing Date". The bankruptcy court could validly do so

under the Bankruptcy Code, and—at this point—it is too late for Defendant, as participants to

Unipharma's bankruptcy proceedings, to collaterally attack that order. *See FutureSource LLC v.

Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) (citing 11 U.S.C. § 363(f)) (holding that

bankruptcy court, pursuant to the Bankruptcy Code, validly extinguished all "interests" in the

assets acquired by the defendant as part of a bankruptcy sale and that plaintiff consented to the sale

by not objecting to the sale).

Defendants argue that the TLA "clearly survived the February 11, 2021 closing" because,

under *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652 (2019), a debtor's rejection

of a trademark license agreement does not eliminate a licensee's right to do whatever the license

agreement permitted it to do, including the right to use the trademark. ECF No. [157] at 118-19. True

enough, but that holding applies only to whether a debtor-licensor's rejection of an executory

trademark license agreement deprives the licensee of its rights to use that trademark. *Mission Prod.

Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657, 203 L. Ed. 2d 876 (2019). But as

Defendants acknowledge, this is not a case where Unipharma, as the debtor-licensor, sought to reject

the TLA. Rather, as set forth above, this is a case where Defendants participated as creditors and did

not object to the Bankruptcy Sale. Under *FutureSource LLC* and Section 363(f) of the Bankruptcy

Code, that consent is significant and ensures the Bankruptcy Court Order validly terminated Bio Dose's

interest in the GlutaDose Mark. The Supreme Court did not hold that "every trademark licensee has

the unfettered right to continue using licensed marks postrejection", so *Tempnology* does not extend to the facts of this case. *See Tempnology, LLC*, 139 S. Ct. at 1666 (Sotomayor, J., concurring). Thus, Defendants' reliance on that case is misplaced.

Regardless, even if the TLA was not terminated by the Bankruptcy Court Order, and New Vision assumed the TLA, the evidence presented at trial demonstrates that New Vision purported to terminate the TLA on July 2, 2021. JX 14 at 2. Yet Bio Dose continued to sell GlutaDose Products through 2022. *See, e.g.*, PX 47; PX 43 at 44. As such, many of Bio Dose's sales of GlutaDose Products could not be covered by the TLA. To the extent New Vision breached the TLA by not allowing Bio Dose to cure its purported breach of the TLA, in accordance with that agreement's provisions, that circumstance is separate from whether the license remained in effect. Defendants have not presented supporting authorities for the proposition that a party's breach of a trademark license agreement by failing to allow a counterparty to cure its own purported breach negates the party's termination of that that agreement. *See* ECF No. [157] at 84.[8] Thus, the Court finds Defendants have not carried their burden to show that they had a valid license through the TLA.

Although the APA requires the parties to enter into "a new Contract in writing" with respect to "all prior arrangement or agreements . . . between [Unipharma and Tamarac] and Bio Dose", that obligation is one between the parties to the Bankruptcy Sale and does not relate to the bankruptcy court's extinguishing of the TLA. *See* APA at 58. To the extent that provision is

---

[8] In any event, no evidence supports that Bio Dose reasonably cured any purported deficiency within a period of 90 days after New Vision sent Bio Dose the cease-and-desist letter. Yet the evidence at trial establishes that Bio Dose continued selling GlutaDose Products through 2022, well after the 90-day period. Even under Defendants' theory that the TLA was not terminated on July 2, 2021, they have not shown it was not terminated after the cure period. *See* TLA at 1 ("[t]his license may be terminated by Licensor *at any time* based upon any breach of this Trademark License Agreement that is not reasonably cured 90 days after Licensee receives written notice thereof") (emphasis added).

redundant or duplicative of the Bankruptcy Court Order, that feature of the APA may reflect the bankruptcy proceeding parties' belt-and-suspenders approach to the Bankruptcy Sale, but that does not alter the Court's conclusion that the Bankruptcy Court order terminated the TLA.

Having so concluded previously, the Court found that there was a dispute of material fact as to whether New Vision and Bio Dose had entered into a *subsequent* licensing agreement, consistent with the APA, after the entry of the Bankruptcy Court Order because there were subsequent sales of GlutaDose Products between Unipharma and Bio Dose. *See* ECF No. [98] at 30-31. However, the parties have clarified that the bankruptcy sale closed on February 11, 2021, PTS at 4, and the evidence at trial confirms that there were no further purchases by Bio Dose from New Vision of GlutaDose Products, consistent with the parties failing to enter into "a new Contract in writing" with respect to "all prior arrangement or agreements . . . between [Unipharma and Tamarac] and Bio Dose[.]" APA at 58. Lacking evidence of a course of dealing between New Vision and Bio Dose after the closing, and of any written license agreements concerning the GlutaDose Mark, Defendants' license defense fails.

### b.  *Exhaustion/First Sale Doctrine*

Because Defendants' license defense fails, so does its exhaustion defense. As the Court has previously explained, under *Bill Blass*, ex-licensees are not permitted to sell off their inventory. ECF No. [98] at 29 (citing *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 153 (3d Cir. 1984)). That holding follows from the practical problem that a licensee could create a large surplus prior to the expiration or termination of a license and give itself a de facto extension of that license. 4 McCarthy on Trademarks and Unfair Competition § 25:31 (5th ed.) (quoting *Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369, 385 (S.D.N.Y. 2000)). Moreover, and fatally to Defendants' argument, the Eleventh Circuit has clearly established that "falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source *or sponsorship* constitutes

infringement." *Mason*, 710 F.2d at 1492 (citation omitted; emphasis in *Mason*). Here, Bio Dose has not merely falsely suggested affiliation with Nutradose, it has falsely suggested it is the owner of the GlutaDose Mark. For that reason, Defendants cannot avail themselves of the first sale doctrine. Bio Dose sold genuine GlutaDose Products, but that is beside the point. Defendants ignore that one of the purposes of the Lanham Act is to assure that "[t]he quality [and value] of a [registrant's mark] lie within his own control." *Am. Farm Bureau Fed'n v. Alabama Farmers Fed'n*, 935 F. Supp. 1533, 1546 (M.D. Ala. 1996), *aff'd sub nom. Amer. Farm Bureau v. AL Farmers*, 121 F.3d 723 (11th Cir. 1997) (quoting *Professional Golfers Ass'n of America.*, 514 F.2d at 670). As one court in the Middle District of Alabama observed, "[e]ven if a defendant's product rivals or exceeds the quality of a registrant's product, the unauthorized product is still trademark infringement because it deprives the registrant of its ability to shape the contours of its reputation." *Id.* (citing *Caterpillar, Inc. v. Nationwide Equipment,* 877 F. Supp. 611 (M.D. Fla. 1994)). Defendants have caused such a deprivation to Nutradose.

Accordingly, the exhaustion defense fails, so Defendants are liable as to Count I.[9] Because the liability analysis for Counts II and III are substantially identical to the analysis in Count I, Defendants are also liable as to those Counts.[10]

---

[9] Having made this conclusion, the Court does not reach Nutradose's argument that Defendants' activities in selling and marketing those products went beyond the mere restock and resale that the First Sale Doctrine protects. *See* ECF No. [156] at 21.

[10] Unlike the GlutaDose Mark, no evidence at trial supported that Unipharma transferred foreign trademark registrations. As such, the Court declines to depart from its finding that there was no genuine issue of material fact as to whether are not liable under Counts I, II, and III for maintaining or registering the GlutaDose marks in foreign jurisdictions. ECF No. [98] at 37. Failing to show that it has a property right in the foreign trademark registrations, the Court declines to grant Nutradose's request for an Order that Santamarta transfer foreign trademark registrations. To the extent the APA contemplated such a transfer, as explained above, liability for breach of the APA is separate from the question of ownership in the property interests in this case. *See* APA at 18 (defining Purchased Assets as "all right, title and interest of each of the Sellers in, to and under all of the assets, properties, interests, rights and claims of the Sellers (whether owned, leased, licensed, used or held for use by the Sellers)").

### C. Count IV (Conversion)

To prevail on a claim for conversion, Nutradose must establish that Defendants committed "[1] an unauthorized act which [2] deprive[d] [Nutradose] of [its] property [3] permanently or for an indefinite time." *Prou v. Giarla*, 62 F. Supp. 3d 1365, 1380 (S.D. Fla. 2014) (citing *Senfled v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So. 2d 1157, 1160-61 (Fla. 3d DCA 1984)). Conversion is an "act of dominion wrongfully asserted over another's property that is inconsistent with the ownership therein." *Special Purpose Accounts Receivable Coop. Corp. v. Prime One Capital Co.*, 125 F. Supp. 2d 1093, 1100 (S.D. Fla. 2000) (citation omitted); *see also* PTS at 22.

Nutradose has failed to show it owned the @glutadose or @glutadose.es accounts. As a threshold manner, although the evidence supports that Unipharma created and operated the accounts through its agent, Creative Hub, Nutradose has not established that it follows from that evidence that the accounts were Unipharma's property. Regardless, the APA provides in Schedule 4.9(d) that the Instagram accounts were not "Material to the Business", and states that such accounts are "potentially Owned Intellectual Property." APA at 197. Nutradose has not shown that the accounts were in fact Intellectual Property, and since the APA describes those accounts as immaterial to the business, the Court finds Nutradose has not presented sufficient facts demonstrating ownership of the accounts. Moreover, because Nutradose has not shown the Instagram accounts are Intellectual Property, it has failed to show Santamarta committed an unauthorized act.

Accordingly, Defendants are not liable for conversion.[11]

---

[11] Nutradose points to "clear" evidence that New Vision purchased the GlutaDose Instagram Accounts, specifically pointing to the testimony of Gonzalez and Petro. As Nutradose recognizes, such lay witnesses are not attorneys qualified to render a legal opinion on the ownership of the Instagram Accounts. ECF No. [158] at 3.

### D.  Count V (FDUTPA)

To prevail on a claim under FDUTPA, Nutradose must establish: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Baptist Hosp., Inc. v. Baker*, 84 So. 3d 1200, 1204 (Fla. 1st DCA 2012) (citation omitted); *see also* PTS at 22. A deceptive act or unfair practice is "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (citation omitted). A finding of liability for trademark infringement will *per se* constitute a violation of FDUTPA. *See Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340 (S.D. Fla. 2017) (granting summary judgment on both a federal trademark infringement claim and a FDUTPA claim because "[c]ertain state law claims are sufficiently similar to Lanham Act claims [so] that the legal analysis for Lanham Act applies to those state law claims. This is true for . . . FDUTPA[.]"); *see also Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) (affirming the trial court's granting of summary judgment on a FDUTPA count based on defendant's violation of federal trademark law).

An individual defendant is personally liable for violations of FDUTPA when the individual was "a direct participant in the dealings." *Fed. Trade Comm'n v. Student Aid Ctr., Inc.*, 281 F. Supp. 3d 1324, 1336 (S.D. Fla. 2016); *see also Rollins v. Heller*, 454 So. 2d 580 (Fla. 3d DCA 1984) (holding that piercing the corporate veil is not required to hold an individual personally liable for violations of FDUTPA, provided the individual was a direct participant in the dealings). The Court has found that Santamarta is liable for trademark infringement under the Lanham Act as the moving force behind Bio Dose's infringement; as the ultimate decisionmaker at Bio Dose, it follows that he was a direct participant in the "deceptive act or unfair practice." *Baker*, 84 So. 3d at 1204.

Accordingly, the Court finds that Defendants are liable for violation of FDUTPA based on that trademark infringement.

### E.  Relief

Nutradose seeks a permanent injunction, Defendants' profits, its actual damages, and attorney fees and costs. The Court considers each of these forms of relief in turn.

#### i.  *Permanent Injunction*

To obtain a permanent injunction, a plaintiff must demonstrate: (1) that it has suffered irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *Tiramisu Intern. LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1286-87 (S.D. Fla. 2010) (citing *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008)). In "ordinary trademark infringement actions . . . complete injunctions against the infringing party are the order of the day. The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks . . . ." *Id.* (citing *SunAmerica Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325 (11th Cir. 1996)) (internal citations omitted).

Here, the Court has found that Bio Dose's use of the GlutaDose Mark likely caused confusion as to the origin of the trademarked goods. Also, based on the complaints from customers on the Zendesk website, together with the evidence that certain GlutaDose Products with lot numbers that Nutradose does not sell are on the Amazon market platform, Nutradose has suffered an irreparable injury stemming from the actual confusion caused by Defendants' use of the GlutaDose Mark. Concretely, that confusion resulted in the loss of goodwill in the GlutaDose Mark for which monetary damages are insufficient compensation. The loss of goodwill further supports that the balance of the hardships favors an equitable remedy, especially where Bio Dose is not

entitled to sell its GlutaDose Products without obtaining a license. Finally, the Court finds that the fourth prong is satisfied because the public "has a paramount interest not to be confused by defendant's infringement." *Tiramisu*, 741 F. Supp. 2d at 1287.

### ii.   *Disgorgement of Profits*

Nutradose has requested disgorgement of Defendants' profits under 15 U.S.C. § 1117 over the period of infringement. ECF No. [1] at 9, 12, 14. A plaintiff "need not demonstrate actual damage to obtain an award reflecting an infringer's profits," as an accounting for profits has been "determined by this Court to further the congressional purpose by making infringement unprofitable and is justified because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future." *Mason*, 855 F.2d at 781. An award of profits is not dependent "upon a higher showing of culpability on the part of defendant, who is purposely using the trademark." *Mason*, 855 F.2d at 781.

As discussed above, the Court finds that Defendants' infringement was intentional because Defendants intended to use the goodwill in the GlutaDose Mark to launch their competing product. Thus, the Court finds that disgorgement of profits is appropriate.

Disgorgement of profits is determined exclusively by the defendant's profits, and is a measure of what the defendant gained, rather than what the plaintiff lost. *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1290 (S.D. Fla. 2010). In assessing profits, the plaintiff "shall be required to prove defendant's sales only." 15 U.S.C. § 1117. The burden then shifts to defendant to "prove all elements of cost or deduction claimed." *Id.*

The Lanham Act "squarely places the burden of proof on the infringer to establish any deductions from its gross sales in order to arrive at the correct profit figure." *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1315-16 (S.D. Fla. 1998). "Moreover, under the Lanham Act and the common law, it is the infringer's burden to prove any proportion of its total profits

which may not have been due to the infringement." *Id.* (citation omitted). "Any doubts about the actual amount of gross sales or profits will be resolved against the infringing party." *Id.* (citation omitted); *see also Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207 (1942) (holding that "[t]here may be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.").

The Court has found that Nutradose has demonstrated that Defendants' sales of infringing GlutaDose Products were $2,788,771.00. Day 1 Trial Tr. at 120-143; *see also* PX 47. Moreover, Nutradose has conceded that Bio Dose's costs or deductions that are attributable to the infringing sales were $1,450,922.00. As such, the Court finds that Bio Dose's costs are $1,450,922.00 since Defendants have not shown its costs exceeded that amount, particularly because the basis for Perez's conclusion that GlutaDose Product sales constituted 95-97% of Bio Dose's operating costs in 2021, and 40% of those costs in 2022, is not discernable from his testimony or the record. *See Tiramisu Int'l LLC,* 741 F. Supp. 2d 1279, 1290 (S.D. Fla. 2010) ("In order to establish the amount of profits to be disgorged, a plaintiff must establish the infringer's gross sales of the product; it is then up to the defendant to refute that amount, and/or to proffer costs that should be deducted from the gross sales.").

Accordingly, as set forth in the Court's findings of fact, Nutradose is entitled to $1,337,848.00 in Bio Dose's profits. *See* Day 1 Trial Tr. at 120-143 (testifying that Bio Dose's sales were $2,788,771.00, and that its related costs were $1,450,922.00); *see also* PX 47.

### iii.   *Actual Damages*

In addition to disgorgement of profits, Nutradose seeks actual damages. The Lanham Act provides for recovery by a successful plaintiff of a defendant's profits, any damages sustained by plaintiff, and the costs of the action. *Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F.3d 1161,

1182 (11th Cir. 1994) (citing 15 U.S.C. § 1117). "This recovery is cumulative, that is, the Court may award [plaintiff] both its damages and [defendant's] profits." *Id.* (citing *Playboy Enters. v. P.K. Sorren Export Co.*, 546 F. Supp. 987, 996 (S.D. Fla. 1982)).

With respect to actual damages, Nutradose seeks actual damages in the amount of $2,528,060.00, comprised of: (1) $606,060.00 in actual damages for being locked out of the foreign markets where Defendant Santamarta unlawfully retained the foreign registrations; (2) $40,000.00 in actual damages for the cost of re-branding GlutaDose in the foreign jurisdictions; (3) $80,000.00 in damages for the loss of the 25,000 followers on the @glutadose Instagram account and $92,000.00 in costs for rebranding a new GlutaDose Product due to the damage to the brand caused by Defendants; and (4) $1,710,000.00 for damage to the goodwill of the GlutaDose brand. In support of those amounts, Nutradose presented the testimony of Mr. Gonzalez, who testified in detail about how he arrived at each amount.

The Court has found that Nutradose had not proven that New Vision owned the foreign registrations; as such, Nutradose is not entitled to $606,060.00 in damages relating to foreign markets. For that same reason, Nutradose has not shown it is entitled to $40,000.00 in damages for re-branding GlutaDose in foreign markets. Moreover, because Nutradose has not shown it owned the Instagram accounts, it is not entitled to the $80,000.00 in damages for the loss of Instagram followers. However, as set forth in the Court's findings of fact, the evidence presented at trial adequately supports that Nutradose suffered damages arising from the cost to rebrand GlutaDose and the loss in goodwill. *See* Day 1 Trial Tr. At 152:6-153:1; *id.* at 156:12-158:4.

Accordingly, as set forth in the Court's findings of fact, Nutradose incurred $92,000.00 in costs to rebrand its GlutaDose Products. Day 1 Trial Tr. at 152:6-159:12. It is therefore entitled to $1,802,000.00 in actual damages.

### iv.     *Attorney Fees and Costs*

Nutradose seeks attorney fees and costs. With respect to the Lanham Act, pursuant to 15 U.S.C. § 1117(a), the court "in exceptional cases may award reasonable attorney fees to the prevailing party." "The statute does not define the term 'exceptional,' but the Eleventh Circuit has repeatedly held that an 'exceptional' case is one that is 'malicious, fraudulent, deliberate and willful, or one in which evidence of fraud or bad faith exists.'" *Tiramisu*, 741 F. Supp. 2d at 1294 (citing *Welding Servs. v. Forman*, 301 Fed. App'x 862 (11th Cir. 2008); *but see Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492 (2020) (holding that "a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate. But acknowledging that much is a far cry from insisting on [bad faith as an] inflexible precondition to recovery . . .")). The Supreme Court has held that an "exceptional" case is "simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).

This is not an exceptional case justifying the award of attorney fees. At bottom, this is a case about the bankruptcy of a nutraceutical packaging company, and the actions that its distributor and a founder took thereafter. Defendants reacted to that bankruptcy by reselling a product that they had previously sold and, later, sought to compete with the buyer in the Bankruptcy Sale by marketing an ostensibly new product. In doing so, Defendants did not sell counterfeit goods; rather, they sold genuine GlutaDose Products, albeit by impermissibly and intentionally leveraging the goodwill of the GlutaDose Mark. But that conduct is a far cry from behavior that the Court can characterize as deliberate, willful, or executed in bad faith. As the March 30, 2022 Email Thread demonstrates, Santamarta attempted to remedy the allegations in the Complaint by consulting with legal counsel. Moreover, the Court finds that counsel for Defendants advanced colorable and

objectively good faith arguments on behalf of Defendants. While those arguments ultimately were not persuasive to the Court, at no point did Defendants proffer frivolous arguments. Moreover, to the extent any defenses or arguments were not meritorious, counsel for Defendants did not press those defenses or arguments. *See, e.g.*, ECF No. [98] at 56 (noting that Defendants failed to respond to argument that their non-distinctiveness defense failed as a matter of law).

With respect to costs, they are awarded to prevailing parties "as a matter of course" under Federal Rule of Civil Procedure 54(d) while 28 U.S.C. § 1920 enumerates the types of costs that may be recovered. *Tiramisu*, 741 F. Supp. 2d at 1297-98. Therefore, the Court finds that Nutradose is entitled to its costs pursuant to Federal Rule of Civil Procedure 54(d). A separate motion seeking to determine the amount for each of these awards should be filed following the Court's Final Judgment, and the Court reserves jurisdiction to determine those amounts.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows.

1. Defendants Bio Dose and Santamarta are liable to Nutradose with respect to the GlutaDose Mark on Counts I, II, III, and V of the Complaint, but not with respect to the foreign trademarks.

2. Defendants are not liable on Count IV of the Complaint.

3. Nutradose is entitled to a permanent injunction, the terms of which the Court will set forth in the Final Judgment in this action.

4. Nutradose is entitled to **$1,337,848.00 in Bio Dose's profits**.

5. Nutradose is entitled to **$1,802,000.00 in actual damages**.

6. Nutradose is not entitled to attorney fees, but it is entitled to costs. Accordingly, Nutradose shall file a separate motion for costs following the Court's entry of Final Judgment in accordance with the Local Rules.

7.   The Court will separately enter a Final Judgment pursuant to Rule 58(a).

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 9, 2024.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

Case No. 22-cv-20780-BLOOM

**APPENDIX**





49

| | | | |
|---|---|---|---|
| | | levels. | |
| Unit count per box* | 30 or 60 Vials | 6 or 12 Vials | 60 Vials |
| Recommended dose | One vial per day. | Two vials the first day, Then one vial per day. | Two vials per day. |
| Frequency | Continuously | Occasionally | Continuously (in addition to medical treatment) |
| Not recommended for | Under 12 years old | Under 12 years old | Under 12 years old |
| Components | Glutathione, Zinc, and Acerola. | Glutathione, Zinc, Acerola, Astragalus, Echinacea, and Selenium. | Glutathione, Zinc, Acerola, Astragalus, Selenio, PQQ and Magnesium. |

*All vials come in 10ml dose

[1]Not recommended for pregnant or nursing women. If any adverse reaction occurs, discontinue use and consult your doctor.

[2]Consult your doctor before using this product: if you have or have had a medical condition, such as an autoimmune disorder; including multiple sclerosis, lupus or rheumatoid arthritis, an organ transplant, acute infection or if you are taking any prescription medications, including immunosuppressive agents. If any adverse reaction occurs, discontinue use and consult your doctor. Recommended: Discontinue product use one week prior to any surgical procedures. Keep this product out of the reach of children.



**The exact dose, manufactured with the latest Blow-Fill-Seal (BFS)**

Developed for cell protection, promoting a reduction of risks due to complications related to infectious processes or aggressions to the cells and immune system

SHOP NOW

**SALES POINTS & TRADEMARK DISCLAIMER**

USA: www.biodosepharma.com - Amazon - Walmart

GLUTADOSE is a registered trademark of NUTRADOSE LABS LLC. BIO DOSE PHARMA, LLC, the maker of the present advertising, is not affiliated with NUTRADOSE LABS LLC.



**Support**
My Account
Shipping and Returns
Privacy Policy
Terms of Use

**Contact Us**
info@biodosepharma.com
+1 (800) 997-3134
5307 NW 108th Ave, Sunrise, FL 33351

**Follow Us**

BioDose Pharma

Copyright ©2022 Bio Dose Pharma LLC

The statements presented in this website have not been evaluated by the Food and Drug Administration. GlutaDose is not intended to diagnose, treat, cure, or prevent any disease.
The information contained on BioDosePharma.com is provided for your general information only. BioDose Pharma does not give medical advice or engage in the practice of medicine. If you are unsure of your condition please see a physician.
Individual results may vary.